PD-0159-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/9/2015 6:01:28 PM
Accepted 2/11/2015 3:45:40 PM
ABEL ACOSTA
CLERK

No. _____

TO THE
COURT OF CRIMINAL APPEALS
OF TEXAS

Jennifer Nicole Kelly, Petitioner

v.

The State of Texas

PETITION FOR DISCRETIONARY REVIEW

From the Tenth Court of Appeals
No. 10-14-00015-CR

**Oral Argument Requested**

FILED IN
COURT OF CRIMINAL APPEALS

February 11, 2015

ABEL ACOSTA, CLERK

Clint F. Sare
TX Bar No. 788354
Counsel for Petitioner
P.O. Box 1694
Bryan, Texas 77806
(979) 822-1505

## IDENTITY OF JUDGE, PARTIES AND COUNSEL

Trial Court Judge:      Jerry Sandel
Sitting by assignment in the
278th District Court of Madison County


Petititioner:      Jennifer Nicole Kelly

    Trial Counsel:      John C. Hafley
1400 13th St.
Huntsville, Texas 77340

    Appellate Counsel:  Clint F. Sare
P.O. Box 1694
Bryan, TX 77806


State of Texas

    Counsel:      Brian Risinger
101 W. Main St. Rm. 207
Madisonville, TX 77864

                Geoff Barr
Abbey Fowler
Office of the Attorney General
P.O. Box 12548
Austin Texas 78711

# TABLE OF CONTENTS

Identity of Judge, Parties and Counsel.................................................................. 2

Table of Contents ...................................................................................... 3

Index of Authorities ................................................................................... 4

Statement Regarding Oral Argument.......................................................... 1

Statement of the Case.................................................................................. 1

Procedural History ...................................................................................... 1

Grounds for Review ................................................................................... 2

Statement of Facts...................................................................................... 2

Argument .................................................................................................... 4

    Ground 1.  The construction of the term "causes" in Section 43.05(a)(2) of the
Penal Code by the court of appeals is contrary to the plain meaning of the term,
other provisions of the Penal Code and the construction of the statute by other
courts.. ........................................................................................................ 4

    Ground 2.   The construction of the term "causes" in Section 20A.02(a)(7) of
the Penal Code by the court of appeals is contrary to the plain meaning of the
term, other provisions of the Penal Code and the construction of the statute by
other courts.................................................................................................. 4

Prayer for Relief.......................................................................................... 9

CERTIFICATE OF COMPLIANCE .............................................................. 10

WITH BRIEF LIMITATIONS AND SERVICE............................................ 10

# INDEX OF AUTHORITIES

**Cases**

*Carrillo v. State*, 98 S.W.3d 789 (Tex. App.—Amarillo 2003, pet. ref'd) ............. 7

*Cotton v. State*, No. 05-95-01070-CR, 1997 WL 331008 (Tex.App.—Dallas June 18, 1997, pet. ref'd), ................................................................................................ 8

*Ex parte Rieck*, 144 S.W.3d 510 (Tex.Crim.App. 2004) ........................................ 6

*Herndon v. State*, 787 S.W.2d 408 (Tex. Crim.App. 1990) .................................... 9

*Johnson v. State*, No. 01-09-00799-CR, 2011 WL 494813 (Tex.App.—Houston [1st Dist.] Feb. 10, 2011, pet. ref'd)(memorandum op.) ...................................... 8

*Rhyne v. State*, 620 S.W.2d 599 (Tex.Crim.App.1981) ........................................... 9

*Smith v. State*, 05-09-01331-CR, 2011 WL 2090256 (Tex.App.—Dallas May 27, 2011, no pet.)(memorandum op.) ........................................................................ 8

*State v. Wood*, 579 P.2d 294 (Or. App. 1978) ........................................................ 7

*Waggoner v. State*, 897 S.W.2d 510 (Tex. App.—Austin 1995, no pet.) ............... 6

*Williams v. State*, No. 05-11-01729-CR, 2013 WL 3974045 (Tex. App.—Dallas Aug. 2, 2013, pet. ref'd) (memorandum op.) ...................................................... 7


**Statutes**

Tex. Govt. Code. § 311.001 - .034 ........................................................................... 5

Tex. Pen. Code § 1.05 .............................................................................................. 6

Tex. Pen. Code § 20A.01(4). .................................................................................... 5

Tex. Pen. Code § 20A.02(a) ..................................................................................... 3

Tex. Pen. Code § 6.04(a) .......................................................................................... 6


**Rules**

Tex. R. App. P. 47.7(a) ............................................................................................. 7

Tex. R. App. P. 9.4(i) ............................................................................................... 10

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner requests the opportunity to present oral argument in support of her petition. This petition concerns issues which are important to the jurisprudence of the State concerning the construction of statutes which have not been addressed by this court. Presentation of oral argument would assist the Court in resolving these issues.

## STATEMENT OF THE CASE

Petitioner was tried before a jury for the offenses of Trafficking of Persons and Compelling Prostitution both arising out of the same events. The State's theory was that Petitioner "caused" a person younger than 18 years to commit prostitution when she provided a room and made phone calls to Spanish speaking potential clients. She was sentenced to 15 years confinement for the first charge and 10 years for the second.

## PROCEDURAL HISTORY

Petitioner presented three issues to the Tenth Court of Appeals challenging the sufficiency of the evidence supporting each conviction and in rendering judgment for repayment of appointed attorney's fees. In a January

8, 2015 published opinion authored by Justice Davis, joined by Chief Justice Gray and Justice Scoggins, the court of appeals found the evidence sufficient to support both convictions but modified the judgment to remove the award of attorney's fees.

## GROUNDS FOR REVIEW

**Ground 1.** The construction of the term "causes" in Section 43.05(a)(2) of the Penal Code by the court of appeals is contrary to the plain meaning of the term, other provisions of the Penal Code and the construction of the statute by other courts.

**Ground 2.** The construction of the term "causes" in Section 20A.02(a)(7) of the Penal Code by the court of appeals is contrary to the plain meaning of the term, other provisions of the Penal Code and the construction of the statute by other courts.

## STATEMENT OF FACTS

The opinion of the Tenth Court of Appeals correctly described the key evidence presented at trial. That evidence was that Petitioner and her mother allowed a number of people who, had nowhere else to go stay, live in their home. (3 RR 38-39, 89). They would help around the house and contribute money when they could. (3 RR 39). Petitioner and her mother allowed some of those people and others who did not live in the house to engage in

2

prostitution in one of the bedrooms. (3 RR 43). They would often, but not always, pay 5 to 10 dollars for use of the room.

The alleged victim, M.M., did not live in the house but engaged in prostitution there with Petitioner's knowledge. (3 RR 43, 80, 125-26). Because Petitioner spoke Spanish and M.M. did not, M.M. would tell Petitioner to call potential Spanish speaking men for her. (3 RR 83). Other times, men would simply show up the house and make an agreement with M.M. or others. The testimony was consistent that Petitioner did not compel anyone to engage in prostitution and they did so on their own, both at the house and elsewhere. (3 RR 40-41, 54, 60).

There was evidence, including her own testimony, that M.M. turned 18 years old in September 2012. (St. Ex. 17). The State relied on evidence that M.M. engaged in prostitution at Petitioner's house before that date to establish its charges against Petitioner for Trafficking of Persons, Penal Code § 20A.02(a)(7)(F), and Compelling Prostitution, Penal Code § 43.05(a)(2). It alleged those specific facts in the indictment. (CR 3). Those facts were also set out in the application paragraphs of the charge. (CR 42-43).

**ARGUMENT**

***Ground 1. The construction of the term "causes" in Section 43.05(a)(2) of the Penal Code by the court of appeals is contrary to the plain meaning of the term, other provisions of the Penal Code and the construction of the statute by other courts..***

***Ground 2. The construction of the term "causes" in Section 20A.02(a)(7) of the Penal Code by the court of appeals is contrary to the plain meaning of the term, other provisions of the Penal Code and the construction of the statute by other courts.***

Both of Petitioner's convictions rest on the same evidence and events. Petitioner's challenge to each likewise arises out of the proper construction of the term "causes" in the applicable Penal Code Provisions and are presented together.

The offense of Compelling Prostitution is set out in section 43.05 of the Penal Code. It provides:

> (a) A person commits an offense if the person knowingly:
> (1) causes another by force, threat, or fraud to commit prostitution; or
>
> (2) causes by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time the actor commits the offense.

Because every witness to testify on the subject was consistent that Appellant did not "force," threaten or engage in fraud to cause M.M. to engage in prostitution, the State conceded that portion of the statute was inapplicable

4

and it was not included in the jury charge. (5 RR 13; CR 43). The State's case rested on subsection (2) which required proof beyond a reasonable doubt that Appellant "caused" M.M. to commit prostitution before she turned 18.

The offense of Trafficking of Persons is set out in section 20A.02(a)(7)(H) of the Penal Code. As the jury was charged here it required the State to prove Petitioner 1) knowingly, 2) traffics a child (meaning they: transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means)[1] and 3) by any means causes the child to become the victim of 4) compelling prostitution.

Because the Penal Code does not define the word "causes" courts must turn to other authority to determine its meaning. This court has not addressed the proper application of the word "cause" in sections 20A.02 or 43.05(a) and should do so now because the construction used by the court of appeals is overly broad and has the effect of criminalizing conduct beyond that intended by the Legislature.

The Legislature has provided guidance on how it expects courts to construe codes adopted as part of the statutory revision program when it enacted the Code Construction Act. Tex. Govt. Code. § 311.001 - .034. The

---

[1] Tex. Penal Code § 20A.01(4).

5

Penal Code was enacted as part of the statutory revision program and the Legislature left a reminder in section 1.05 of the Penal Code that the Code Construction Act applies. Tex. Pen. Code. § 1.05. For terms which are not statutorily defined, the common usage is determined by reference to dictionaries. *Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex.Crim.App. 2004). Definitions of "cause" provided by WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Unabridged) include: 1. A person thing, fact or condition that brings about an effect or that produces or calls forth a resultant action or state; and 3. Something that occasions or effects a result: the necessary antecedent of an effect.

The opinions of other intermediate Texas courts are consistent with this common meaning. The primary case construing section 43.05 is *Waggoner v. State*, 897 S.W.2d 510, 512 (Tex. App.—Austin 1995, no pet.). In looking for the Legislature's intent it considered Penal Code Section 6.04(a) on criminal responsibility which provides:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

897 S.W.2d at 512. It also considered the construction of a similarly worded statute in Oregon. The Oregon court construed that state's statute was violated by "one who provides opportunity for a willing minor to engage in prostitution

6

*and* influences, persuades or prevails upon her to do so[.]" 897 S.W.2d at 512 (quoting *State v. Wood*, 579 P.2d 294, 296 (Or. App. 1978)). A footnote in the *Wood* opinion shows the jury was specifically instructed that affording a minor the opportunity to engage in prostitution was *insufficient* to satisfy the statute. 578 P.2d at 296, n. 1. The holding that providing an opportunity for a minor to engage in prostitution is insufficient to support conviction was made with the recognition of the statute's purpose to "provide maximum protection for minors[.]" *Id.*

The facts and holding of *Waggoner,* and every case following it, have supported the rule that to support a finding a defendant "caused" another to engage in prostitution within the meaning of the Penal Code requires more than affording them an opportunity to do so. In each the facts show control over the minor's prostitution. In *Williams v. State*, No. 05-11-01729-CR, 2013 WL 3974045 (Tex.App.—Dallas Aug. 2, 2013, pet. ref'd) (memorandum op.),[2] the defendant taught the complainant how to engage in prostitution, provided condoms and a phone for prostitution work, and set a "quota" for the amount of money victims were required to earn each day.). In

---

[2] Because unpublished opinions lack precedential value, *see* Tex. R. App. P. 47.7(a), Petitioner need not distinguish them. *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd). The opinions are discussed to provide a more complete discussion of the available authority. That authority supports Petitioner's first point of error.

*Johnson v. State*, No. 01-09-00799-CR, 2011 WL 494813 (Tex.App.— Houston [1st Dist.] Feb. 10, 2011, pet. ref'd)(memorandum op.), the defendant likewise: instructed the complainant to work as a prostitute, told her where to work and to give him all the proceeds of prostitution work. The defendant in *Smith v. State*, 05-09-01331-CR, 2011 WL 2090256 (Tex.App.—Dallas May 27, 2011, no pet.)(memorandum op.), told the complainant where and how to prostitute, and encouraged her to advertise her services on the Internet and collected money earned from prostitution. The facts were virtually the same in *Cotton v. State*, No. 05-95-01070-CR, 1997 WL 331008 (Tex.App.— Dallas June 18, 1997, pet. ref'd), where the evidence showed the defendant decided where the complainant would work, how much money she needed to make and collected all the money made.

Although the evidence showed Petitioner was aware M.M. engaged in prostitution in Petitioner's home and conveyed messages from M.M. to Spanish speaking men, that is no evidence she influenced, persuaded or prevailed upon M.M. to engage in prostitution. The evidence also does not support a finding that Petitioner "caused" M.M. to engage in prostitution under the definition contained in the Penal Code because it shows M.M. engaged in prostitution without Petitioner's involvement so a factfinder could not rationally find it would not have occurred "but for" petitioner's conduct.

8

The opinion of the court of appeals is inconsistent with the established rule that knowledge of an offense, even one committed in the person's presence, does not make a person liable for that offense. *Rhyne v. State*, 620 S.W.2d 599 (Tex.Crim.App.1981); *Herndon v. State*, 787 S.W.2d 408, 410 (Tex.Crim.App. 1990). The construction of the statutes by the court of appeals would impose felony criminal liability on any homeowner or hotel owner or manager who can be shown to be aware of prostitution. Under section 43.05(a)(2) the Legislature has made irrelevant the defendant's knowledge of the age of a the person actually engaging in prostitution. It could likewise impose felony criminal liability on a person who acted as a translator between parties who later engaged in prostitution.

The cases discussed above illustrate the circumstances for which the language chosen by the Legislature imposes liability for Compelling Prostitution or Trafficking of Persons. The evidence in this case fell short and the court of appeals erred in finding the conduct shown here "caused" M.M. to engage in prostitution.

### PRAYER FOR RELIEF

For the foregoing reasons, petitioner prays this court grant her petition, allow briefing on the merits, that the opinion and judgment of the Tenth Court of Appeals be reversed and render a judgment of acquittal or, in the

9

alternative, reform the judgment to reflect conviction for a lesser included offense.

Respectfully submitted,

_/s/ Clint F. Sare_____
Clint F. Sare
Attorney of petitioner,
Texas Bar Num. 788354
P.O. Box 1694
Bryan Texas, 77806
(979) 822-1505

## CERTIFICATE OF COMPLIANCE
## WITH BRIEF LIMITATIONS AND SERVICE

I certify the foregoing document does not exceed the word count limitation of Rule of Appellate Procedure 9.4(i) based on the computer software word count of 1856 words.

I certify a copy of the foregoing document was served on counsel for appellee by first class mail to 101 W. Main St. Rm. 207, Madisonville, TX 77864 on February 9, 2015.

_/s/ Clint Sare _____

Appendix A



**IN THE**
**TENTH COURT OF APPEALS**

**No. 10-14-00015-CR**

**JENNIFER KELLY,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 278th District Court**
**Madison County, Texas**
**Trial Court No. 13-11915-278-15**

## OPINION

A jury convicted Appellant Jennifer Kelly of the offenses of trafficking of persons and compelling prostitution and assessed her punishment at fifteen and ten years' imprisonment, respectively. This appeal ensued.

### Sufficiency of the Evidence

In her first two issues, Kelly contends that the evidence was insufficient to support her convictions for trafficking of persons and compelling prostitution.

*Standard of Review*

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

If the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

*The Evidence*

The evidence presented in this case was as follows: Madisonville Police Officer

Aaron Campbell testified that on April 26, 2013, the Department executed a search warrant at 702 East Collard Street in Madisonville, a residence known to be Kelly's. Campbell took photographs of everything. The photographs showed three bedrooms, one of which was Kelly's. Above Kelly's bed was a photograph of M.M. Campbell stated that he believed the photograph was important because it verified that M.M. was connected with the residence.

Dorothy Carnal testified that both Kelly and Kelly's mother took into their home people who had nowhere else to go. In fact, Carnal met Kelly in April 2012 when, because Carnal had nowhere to go, Kelly said that she could stay in the home as long as she helped around the house and paid a little bit of money to Kelly's mother if she could. Kelly usually took in females, and, besides Carnal, Kelly took in M.M., Nicole Shelton, Stephanie Stansbury, and Jessica Hoot. A man named Jason McKinney also lived there for about a month. Kelly would feed the people that she took in and buy clothes for them, if needed. This included M.M. M.M. needed things every now and then, and Kelly would help her if she could.

Carnal testified that she met M.M. about a week after meeting Kelly in April 2012. On the first or second day after meeting, M.M. asked Carnal to go to the park with her so that Carnal could be a lookout while M.M. had sex with a guy. Carnal said that M.M. would also "come looking for trouble" at the house. M.M. did not live at the house, but she did stay there every now and then. M.M. would come over to Kelly's house and tell Kelly that she needed her to make phone calls to guys with whom she could have sex because she needed money. M.M. would have sex with the guys in the

middle bedroom of the house and receive money from them. Carnal said that she did not know how much money M.M. got from the guys but that M.M. would always flash her money around in front of everyone. When asked if Kelly ever received any money when M.M. would have sex with guys in the house for money, Carnal replied that she thought M.M. would give Kelly $5 but that she did not know if the guys paid Kelly.

When asked what her response would be to an allegation that Kelly forced M.M. to engage in prostitution, Carnal replied that Kelly never forced anyone to do anything. Carnal stated, "Well, you know, we had a little set up. But [Kelly] didn't force nobody to do nothing that they didn't want to do." Carnal said that she heard that M.M.'s mother was the one who forced M.M. into prostitution. M.M.'s mother came over to Kelly's house a few times, and Carnal thought that M.M.'s mother had actually engaged in prostitution at the house once or twice.

Carnal remembered seeing M.M. over at the house in the May/June 2012 timeframe. Carnal stated, "After [M.M.] first came around that was it, she was there all the time." Carnal was positive about the timeframe even though her own overall drug use, including having done heavy drugs in the preceding two or three years and having smoked pot as recently as three days before testifying, had affected her memory. Carnal remembered M.M. having sex for money in the middle bedroom of the house during those months. Carnal finally left Kelly's house in about November or December 2012 with Stephanie Stansbury.

Stansbury testified that Kelly would take people in if they did not have anywhere to go. She considered Kelly her friend, and Kelly helped her out, including

providing her food and clothing and allowing her to live with her from about August to December 2012. Carnal, M.M., and a woman named Nicole also lived at Kelly's house at some point. Stansbury confirmed that there was a picture of M.M. in Kelly's bedroom.

Stansbury testified that she met M.M. in early August 2012. She and M.M. did not get along because of a dispute over a guy named Alfredo. Beginning in about June 2012, Stansbury would take Alfredo over to Kelly's house, drop him off, and then pick him back up later. When she herself then started going over to Kelly's house, she found out that Alfredo had been going over to the house to see M.M. When asked if M.M. was at Kelly's house in June 2012, however, Stansbury replied, "I'm not sure. I just know I would drop [Alfredo] off and pick him up." Stansbury moved on from Alfredo and started seeing Michael Briock on August 2, 2012, but she and M.M. had a dispute over Alfredo until about December 2012.

Stansbury testified that M.M. engaged in sex at Kelly's house and other places of her own free will; Kelly did not force M.M. to engage in sex. M.M. would get into fights with her mother and just show up at Kelly's house. When asked how M.M. would then end up having sex at the house, Stansbury replied, "Just if somebody would show up that decided that they wanted her she would go - - she would do it." M.M. would use the middle bedroom at Kelly's house. M.M. would bring Xanax bars with her to the house and said that the more Xanax bars she took, the easier it was for her to have sex. Stansbury said that she believed that M.M. got paid for having sex. Stansbury had also engaged in prostitution, and based on that experience, she knew what M.M. was doing.

Briock had also bragged to her that he and M.M.'s mother were the ones that had gotten M.M. into having sex for money. When asked if M.M. ever paid Kelly out of the money that she made from the guys, Stansbury replied that the guys would pay Kelly only "like five dollars for use of the room." Stansbury saw this during "August-September, September-October-ish" 2012.

Stansbury testified that she left Kelly's house in December 2012 because Briock asked her to leave. When asked how well she knew M.M. after December 2012, Stansbury replied that she took M.M. to Huntsville where they were "turning tricks" and that she also took M.M. down to Galveston once. Stansbury said that her dad called her when Kelly was arrested. She got on the internet and read the news websites. She then wrote a comment online that stated:

> [Kelly] has never forced nobody to sell themselves, if anyone was even doing that to begin with it was of their own choosing. [Kelly] did however try to take in people when they had nowhere to go, even if the person was undeserving of it. They would steal from her and she would still let them back, and I've never known there to be minors there except for [M.M.] and she was 17, which I believe is legal age to give consent.

Stansbury explained that she was angry and using methamphetamine when she wrote the comment and had no idea how old M.M. was. She believed that M.M. was eighteen years old when she met her at Kelly's house. At the time of trial, Stansbury was in the Walker County jail.

M.M. testified that she was born on September 3, 1994, and her birth certificate was admitted into evidence. She turned eighteen years old on September 3, 2012, and was nineteen years old at the time of trial. M.M. stated that she had never lived with

her father and had nothing to do with him; he only called her when he was drunk. She had a good relationship with her mother.

M.M. testified that she first met Kelly in Normangee when she was fourteen years old. They became friends, and at some point M.M. lived with her there. When Kelly moved to Centerville, M.M. went with her, and they became best friends. M.M. said that she did not live with Kelly in Centerville but that she did stay off and on with her. When she was with Kelly, they would just "[c]hill and hang out and party." M.M. eventually went to Madisonville to Kelly's house. Kelly's grandmother owned the house, and Kelly's mother lived in the house. Kelly's mother ran the house when she was alive and would give M.M. a place to stay. M.M. would stay at the house off and on. M.M.'s mother and Kelly also knew each other, and M.M.'s mother hung out at the house at times. Kelly's mother passed away when M.M. was eighteen years old.

M.M. testified that she had engaged in prostitution to earn money. Her mother had engaged in prostitution at times as well. M.M. said that no one forced her or her mother to do it. The first time M.M. engaged in prostitution was in Centerville when she was fourteen years old. Kelly called a guy, and they went to a motel where M.M. had sex for money. M.M. also engaged in sex, sometimes for money, at Kelly's house in Madisonville, as well as at other places in Madisonville. Several photographs that M.M. posted to Facebook during June and July 2012 were admitted into evidence. M.M. would have been seventeen years old when the pictures were taken. The photographs show M.M. in Kelly's house, and M.M. stated that when she was at Kelly's house during those dates, she was having sex for money over there. When asked how she

would get the guys to Kelly's house, M.M. replied, "[Kelly] would call them and then get them, and then I would tell her to call some licks for me because I need money."[1] The guys would be of Mexican nationality only. When asked why just the one nationality, M.M. replied that she did not know. M.M. said that she made different prices for having sex with different guys. When asked if she ever had to give Kelly any of the money, M.M. responded, "I mean, I would give her, you know, just give her money like man, quit, here." When asked how much she would give her, M.M. said, "I don't know the  -  -  exactly price. I would just give her money, you know. Just get her what she needs, you know, cigarettes." The guy or "lick" would give $5 to Kelly when he came over.

Madisonville Police Lieutenant Jonathan Zitzmann testified that he and Corporal Gary Laws[2] conducted an interview with Kelly on April 16, 2013, regarding prostitution and human trafficking. Portions of the audio/video recording of the interview were admitted into evidence. During the interview, Kelly stated that the females, including Dorothy Carnal, Stephanie Stansbury, Nicole Shelton, and M.M., would use the middle bedroom of the house for prostitution. Kelly said that the females had a preference for Hispanic men because they thought that the men were less likely to be the law. Kelly speaks Spanish fluently, so she would translate for the females. Kelly stated that she would receive $5 from the female and $5 from the male to use the middle bedroom for prostitution. Kelly said that M.M. always argued with her about how much she should

---

[1] M.M. explained that the guys with the money were referred to as "licks."

[2] M.M. testified that she knew Laws from when "they" would come over to Kelly's house. M.M. stated that she had told Laws that he was "hot" but that that would not make her lie while testifying.

give her, but M.M. would also give her gifts sometimes.

On cross-examination, Zitzmann acknowledged that he never mentioned in the interview the timeframe that these acts occurred. He never talked specifically about June to July 2012. Zitzmann also acknowledged that he was aware that Kelly's mother was living in the house during June and July 2012 but that he had never talked to Kelly's mother in reference to this case. Zitzmann acknowledged that M.M. was eighteen years old at the time the interview occurred.

Finally, Lieutenant Melinda Poe, the jail administrator for the Madison County jail, testified that she was in charge of the jail calls, meaning any communication the inmates had with the outside world. The jail calls are all recorded for the safety and security of the facility. Clips of several of Kelly's jail calls were admitted into evidence. During these calls, Kelly stated, "I didn't do nothing. I mean I might have translated a little bit before for people that don't speak English – I'm just helping people you know?" Kelly said that she was just putting a roof over homeless people's heads; they were already prostitutes when they got there. Kelly admitted, however, that she let M.M. use the middle room, and in speaking of M.M., Kelly said, "The only way they got a case is if she takes the stand, you know."

After the State rested, Nicole Shelton testified that she had lived in the middle room of the house at 702 East Collard for about seven or eight months beginning on October 2, 2012. Kelly's mother was still alive at that time; she owned the house and controlled who lived and visited there. Kelly's mother passed away on February 4, 2013. Shelton was still living in the house when the search was conducted on the house,

and Jason McKinney was her boyfriend at the time.

Shelton testified that she knew of M.M. but never associated with her until she began living at Kelly's house in October 2012. M.M. was eighteen at that time. M.M.'s mother usually drove M.M. to and from the house, and M.M.'s mother would stay at the house with M.M. They were at the house fairly often. Shelton did not remember seeing M.M. at the house without her mother there. Shelton and M.M. did not get along, but M.M. would talk to Shelton about Laws often. When asked what M.M. said about Laws, Shelton replied, "She said that her and Officer Gary Laws would mess around and basically have sex." "She would mention that she had strings she could pull. But which basically means she could get out of trouble because of what she was doing with Officer Laws."

Shelton testified that M.M. would engage in prostitution at Kelly's house but that Kelly never forced M.M. to do so. Shelton, Carnal, and Stansbury also prostituted at the house. When asked how M.M. found the guys with whom she engaged in prostitution, Shelton replied, "It was just friends that she had had." When asked how she herself got the guys over to the house, Shelton replied, "They were friends that I knew that would come over." But Shelton also said that the guys that would come over to engage in prostitution were guys that would work in the oil field or weld. They were "[r]aces of any kind." Kelly speaks Spanish, and when asked if it was true that Kelly was a translator that set up the dates with a lot of the guys that came over, Shelton replied, "Only with the ones that anybody couldn't speak with." They would use the middle room of the house to engage in prostitution. She, Carnal, Stansbury, and M.M. never

gave Kelly any money for the guys that came over. Carnal would be lying if she said that she gave Kelly $5 from each transaction. When asked, however, if it would surprise her that Stansbury testified that Kelly would get $5 from each transaction, she replied that it would not surprise her. Shelton then stated, "Honestly, I don't know. I have never seen any money transfer."

Shelton testified that she cares a lot for Kelly. Kelly gave her a place to live when she had nowhere to live. Kelly bought her food and clothes and provided friendship. Kelly's mother also gave her food and shelter. Shelton said that she is not a big fan of M.M. because M.M. was ungrateful for what Kelly did for her; Kelly had provided M.M. her house, food, friendship, and an opportunity to make money out of her house.

Jason McKinney then testified that he lived in Kelly's house during part of 2012 and 2013. He moved into the house when he started dating M.M. in October 2012. The relationship lasted about a month. He then dated Shelton and was living in the middle room of the house. He saw M.M. and her mother at the house many times. He stated that Kelly's grandmother owned the house and that Kelly and her mother lived in the house and controlled the house.

In rebuttal, Madisonville Police Officer Jonathan Lawrenz testified that he was on street patrol on February 22, 2011, when they received an anonymous phone call about possible drug activity at the Western Lodge. When they got to the Western Lodge, they informed the manager why they were there. They then pulled around to the room and saw that the door was open and that Kelly was standing outside the room by the door. Lawrenz got out of his patrol car and walked up to the door. When he

looked inside the room, he saw an older white gentleman laying on the bed and a young white female standing at the foot of the bed naked. There was also another female standing by the door where Kelly was.

Lawrenz testified that he made contact with Kelly, who said that she had rented the room. Kelly provided her birthdate as November 7, 1979, making her thirty-one years old at the time. They told the young girl who was naked to put on her clothes. She was identified as M.M. M.M. said that she was seventeen years old; however, when they got to the jail, they found out that M.M. was actually only sixteen years old at the time. The older gentleman was fifty-three years old at the time.

Lawrenz testified that they got consent to search the room. When they walked in, they found used condoms all over the floor. Lawrenz stated that it appeared to him that sex had been occurring in the room. He tried to ascertain whether prostitution was going on in the room, but they denied it. No one was arrested for prostitution that night.

*Compelling Prostitution*

A person commits the offense of compelling prostitution if the person knowingly "causes by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time the actor commits the offense." TEX. PENAL CODE ANN. § 43.05(a)(2) (West Supp. 2014). Because M.M. turned eighteen years old on September 3, 2012, the indictment and the jury charge limited the alleged compelling prostitution to a period of time of "on or about and between" June 1, 2012 and July 31, 2012. Kelly argues that the evidence is insufficient to prove that (1)

she "caused" M.M. to engage in prostitution and (2) if such conduct occurred, it occurred before M.M. turned eighteen years old.

We begin with causation. In *Waggoner v. State*, 897 S.W.2d 510 (Tex. App.—Austin 1995, no pet.), the appellant argued that the evidence was insufficient to support the jury's finding that he was guilty of compelling prostitution because there was insufficient evidence of causation. *Id.* at 511-12. In addressing this issue, the Austin Court of Appeals observed that Texas law provides little guidance as to the meaning of causing a minor to commit prostitution "by any means" beyond the Penal Code's general definition of causation: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id.* at 512 (citing TEX. PENAL CODE ANN. § 6.04(a) (West 2011)). The Austin court thus looked at *State v. Wood*, 579 P.2d 294 (Or. Ct. App. 1978), a case in which the Oregon Court of Appeals construed a similar penal statute. *Waggoner*, 897 S.W.2d at 512. The statute at issue in *Wood* provided: "A person commits the crime of compelling prostitution if the person knowingly … [i]nduces or causes a person under 18 years of age to engage in prostitution." *Wood*, 579 P.2d at 295-96 (citing OR. REV. STAT. ANN. § 167.017(1)(b)). The Oregon court stated: "The purpose of … this statute is to provide maximum protection for minors from the harmful, cumulative effects of a life of prostitution…. [The statute] is intended to prohibit 'conduct that exploits the immature' regardless of coercion." *Id.* at 296. The Oregon court therefore held: "[O]ne who provides opportunity for a willing minor to

engage in prostitution and influences, persuades or prevails upon her to do so has induced or caused the prostitution within the meaning of the statute regardless of her consent." *Id.* In light of this, the Austin court held in *Waggoner* that the evidence was sufficient to support the jury's finding that the appellant knowingly caused the minor to commit prostitution because the record established that (1) the appellant clearly provided the opportunity for the minor to engage in prostitution and (2) the appellant persuaded the minor to go through with the encounter. *Waggoner*, 897 S.W.2d at 512-13.

Kelly argues that under the standard stated in *Wood* and approved of in *Waggoner*, it is *not* sufficient that she provided an opportunity for a willing minor to engage in prostitution but that she must have *also* influenced, persuaded, or prevailed upon the minor to engage in prostitution and that there is no evidence that she influenced, persuaded, or prevailed upon M.M. to engage in prostitution. Kelly asserts that the evidence showed that M.M.'s decisions during the time set out in the indictment and jury charge were made independent of her influence. Kelly further argues that the evidence is insufficient under the "but for" test of causation stated in section 6.04(a) of the Penal Code and discussed in *Waggoner* because the evidence showed that the same conduct of M.M. that occurred at her house also occurred at other locations away from her.

We conclude that the evidence was sufficient to prove that Kelly "caused" M.M. "by any means" to engage in prostitution. The evidence that Kelly complied with M.M.'s request to make phone calls to the men for her and acted as a translator is arguably sufficient to show that Kelly "influenced" M.M. to engage in prostitution. But

the compelling-prostitution statute states that a person commits the offense if she causes a child younger than eighteen years to commit prostitution "by any means," not "by providing opportunity for a willing minor to engage in prostitution and influencing, persuading or prevailing upon her to do so." In other words, while providing a willing minor the opportunity to engage in prostitution and influencing, persuading, or prevailing upon her to do so is one way to commit the offense of compelling prostitution, the statute does not limit that conduct to the only conduct by which a person commits the offense. Instead, we look back at the Penal Code's general definition of causation: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a). And in this case, viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found that but for Kelly's conduct in making the phone calls to the men for M.M., acting as a translator, and providing a bedroom in her house, M.M. would not have engaged in prostitution with those men at Kelly's house.[3]

We now turn to whether the evidence was sufficient to prove that the conduct of Kelly's that caused M.M. to engage in prostitution occurred before M.M. turned eighteen years old. The foregoing evidence showed that M.M. was engaging in prostitution at Kelly's house before she turned eighteen years old. The evidence also

---

[3] It is irrelevant that the evidence showed that M.M. engaged in prostitution at other locations away from Kelly as long as the jury could have found that but for Kelly's conduct, M.M. would not have engaged in the specific acts of prostitution that occurred at Kelly's house.

showed that Kelly made calls to the men at M.M.'s request to get them to Kelly's house and that Kelly acted as a translator during those calls. While the evidence does not directly show that Kelly's conduct of making the calls for M.M. and of acting as a translator occurred before M.M. turned eighteen, the jury could have drawn that inference. *See Lucio*, 351 S.W.3d at 894 (quoting *Jackson*, 443 U.S. at 319) (stating that sufficiency standard "'gives full play to the responsibility of the trier of fact fairly … to draw reasonable inferences from basic facts to ultimate facts.'"). Viewing the evidence in the light most favorable to the verdict, we therefore conclude that the evidence was sufficient to prove that the conduct of Kelly's that caused M.M. to engage in prostitution occurred before M.M. turned eighteen years old.

The evidence was thus sufficient to support Kelly's conviction for compelling prostitution. We overrule Kelly's first issue.

*Trafficking of Persons*

A person commits the offense of trafficking of persons if the person knowingly "traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by" Section 43.05 (Compelling Prostitution). TEX. PENAL CODE ANN. § 20A.02(a)(7)(H) (West Supp. 2014). Again, because M.M. turned eighteen years old on September 3, 2012, the indictment and the jury charge limited the alleged trafficking of persons to a period of time "on or about and between" June 1, 2012 and July 31, 2012. Kelly argues that (1) for the reasons discussed with regard to compelling prostitution, the evidence is insufficient to support the "causes" element of the offense of trafficking of persons and (2) the evidence is insufficient to support a

finding that she "trafficked" a child.

Having already addressed and overruled Kelly's causation argument above, we turn directly to Kelly's argument that the evidence is insufficient to support a finding that she "trafficked" a child. "Traffic" means to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means. *Id.* § 20A.01(4).

At a minimum, Kelly "harbored" M.M. The most commonly recognized meanings of the word "harbor" as a verb are "to give shelter to" and "to give refuge to." *Urbanski v. State*, 993 S.W.2d 789, 793 (Tex. App.—Dallas 1999, no pet.) (holding that definition of "harbor" is broad enough to encompass providing runaway child with shelter, transportation, or a home). The definition of "refuge" includes protection, or a source of help, relief, or comfort. *Id.*

Kelly argues that the undisputed evidence that M.M. did not live at her home and that she would be brought there by her mother precludes a rational factfinder from finding beyond a reasonable doubt that she "harbored" M.M. But even if M.M. did not live at Kelly's house, the evidence shows that M.M. stayed there at times and that Kelly provided M.M. with necessities like food and clothing when she needed it. Specifically, Stansbury testified that M.M. would get into fights with her mother and just show up at Kelly's house. Carnal testified that Kelly would feed the people that she took in and buy clothes for them, if needed, that this included M.M., and that M.M. needed things every now and then and Kelly would help M.M. if she could. Even Shelton, a defense witness, stated that she thought M.M. was ungrateful because Kelly provided her house, food, and friendship and gave M.M. an opportunity to make money out of her

house.  Viewing the evidence in the light most favorable to the verdict, we therefore conclude that the evidence was sufficient to prove that Kelly "harbored" and thus "trafficked" M.M.

The evidence was therefore sufficient to support Kelly's conviction for trafficking of persons.  We overrule Kelly's second issue.

## Attorney's Fees

In her third issue, Kelly contends that the trial court erred in rendering judgment for attorney's fees in the absence of evidence of her ability to pay attorney's fees.  The State concedes that the judgments should be modified.

The clerk's record reflects that, before trial, the trial court found that Kelly was indigent and appointed an attorney to represent her.  Once Kelly was initially found to be indigent, she was presumed to remain indigent for the remainder of the proceedings unless it was shown that a material change in her financial resources had occurred.  *See* TEX. CODE CRIM. PROC. ANN. art. 26.04(p) (West Supp. 2014).  The trial court did not make any findings or otherwise address Kelly's financial condition again before signing the judgments.  Furthermore, after signing the judgments, the trial court appointed an attorney for appeal, stating:  "The Court finds that Jennifer Kelly, Defendant, is indigent, and is entitled to the appointment of counsel to represent said Defendant on appeal."  Therefore, we sustain Kelly's third issue and modify the judgments to delete the assessment of attorney's fees.  *See Mayer v. State*, 309 S.W.3d 552, 555-56 (Tex. Crim. App. 2010).

## Conclusion

Based on the foregoing, we modify the trial court's judgments to delete the assessment of attorney's fees. We affirm the judgments as modified in all other respects.

REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed as modified
Opinion delivered and filed January 8, 2015
Publish
[CR25]





# TENTH COURT OF APPEALS

**Chief Justice**
*Tom Gray*

**Justice**
*Rex D. Davis*
*Al Scoggins*

McLennan County Courthouse
501 Washington Avenue, Rm 415
Waco, Texas 76701-1373
Phone: (254) 757-5200          Fax: (254) 757-2822

**Clerk**
*Sharri Roessler*

January 8, 2015

In accordance with the enclosed Memorandum Opinion, below is the judgment in the numbered cause set out herein to be entered in the Minutes of this Court as of the 8th day of January, 2015.

10-14-00015-CR          JENNIFER KELLY v. THE STATE OF TEXAS - ON APPEAL FROM THE 278TH DISTRICT COURT OF MADISON COUNTY - TRIAL COURT NO. 13-11915-278-15 - AFFIRMED AS MODIFIED - Memorandum Opinion by Justice Davis:

"This cause came on to be heard on the transcript of the record, and the same being considered, because it is the opinion of this Court that there was error in reciting in the judgment, the judgment is reformed to delete the finding that Kelly pay her court appointed attorney's fees. It is therefore ordered, adjudged and decreed by the Court that, as reformed, the judgment be in all things affirmed, and that the appellant pay all costs in this behalf expended and that this decision be certified below for observance."