

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00126-CR

_____

MARTHA ARACELY RICHTER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Ellis County, Texas
Trial Court No. 1411631CR

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

# O P I N I O N

On Valentine's Day 2014, after a heated argument with her boyfriend resulted in a breakup, Martha Aracely Richter crashed a car violently into a guardrail on Interstate Highway 45 in Ellis County, Texas.[1]  During the investigation of the one-vehicle crash, Richter told emergency responders that she was depressed, indicated that she wanted to die, and admitted that she had ingested some of her regularly-prescribed medication on the day before the accident.  The responding police officer's encounter with Richter led him to believe that she was driving while under the influence of her prescription medication.  Following a bench trial, Richter was convicted of driving while intoxicated (DWI), a class B misdemeanor.  Her sentence of 180 days' confinement in the Ellis County Jail and the assessment of a $300.00 fine were suspended, and she was placed on community supervision for a period of two years.

On appeal, Richter argues that the evidence is insufficient to support the trial court's finding of guilt.  She also argues that the trial court erred in allowing (1) State Trooper Craig Henry, a drug recognition expert, to offer expert testimony that Richter was intoxicated solely based on his review of medical records and the audio/video recording (recording) of the field-sobriety tests and (2) the arresting officer to testify about statements made by Richter's boyfriend over her hearsay objections.  We find that the verdict is supported by legally sufficient evidence, that the trial court did not err in allowing the drug recognition expert to testify, and that the

---

[1]Originally appealed to the Tenth Court of Appeals in Waco, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013).  We follow the precedent of the Tenth Court of Appeals in deciding this case.  *See* TEX. R. APP. P. 41.3.

statements made by Richter's boyfriend were not offered for the truth of the matter asserted and, thus, were not hearsay. Consequently, we affirm the trial court's judgment.

**I.      The Evidence is Sufficient to Support the Trial Court's Finding of Guilt**

**A.      Standard of Review**

In *Lucio v. State*, the Texas Court of Criminal Appeals expressed the standard of review for a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

In conducting a legal sufficiency review, we "'consider[] all evidence in the record of the trial, whether it was admissible or inadmissible[,]' . . . 'proper or improper.'" *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001)). "If the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Kelly v. State*, 453 S.W.3d 634, 636 (Tex. App.—Waco 2015, pet. ref'd) (citing *Jackson*, 443 U.S. at 326). "[T]he fact-finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony

3

presented by the parties." *Id.* (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)).

"The sufficiency of the evidence is measured by reference to the elements of the offense as defined by a hypothetically correct jury charge for the case." *Jackson v. State*, 399 S.W.3d 285, 290 (Tex. App.—Waco 2013, no pet.) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically-correct jury charge (1) accurately sets out the law, (2) is authorized by the indictment, (3) does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and (4) adequately describes the particular offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

"A person commits an offense if the person is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE ANN. § 49.04(a) (West Supp. 2015). "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." TEX. PENAL CODE ANN. § 49.01(2)(A) (West 2011). Here, Richter challenges whether the evidence was legally sufficient to demonstrate that she was intoxicated.

### B. The Evidence at Trial

Gilbert Ruiz, an officer with the Palmer Police Department, responded to Richter's one-vehicle crash at approximately 4:00 a.m. The car sustained significant damage in the collision, which had caused the air bag to be deployed. Ruiz testified that upon arriving at the scene, he found Richter in the driver's seat, that she was glassy-eyed when she spoke, slurred her speech,

4

and spoke in a "very disoriented" fashion. An audio/videotaped recording[2] of Ruiz' encounter with Richter confirmed Ruiz' testimony.[3] After obtaining Richter's driver's license, Ruiz spoke by telephone with Richter's then-boyfriend, Emigdio Castillo. On the recording, which included Ruiz' side of the conversation, Ruiz can be heard asking Castillo what kind of pills Richter had taken. During that same recording, Ruiz states to another officer, "I just talked to her . . . boyfriend. She's taken a lot of pills."

According to Ruiz, Richter told emergency medical responders that she was suffering from back pain, was "very depressed," and was in possession of several prescription medications. Richter told Ruiz that she had taken something for anxiety and two Tramadol for pain. In addition to those medications, Ruiz found Tylenol-Codeine, Celexa, and Baclofen in her purse. According to Ruiz, Richter admitted to taking "some" pills, but did not clarify exactly how many pills she had taken before the accident.

Richter was eventually cleared by emergency medical personnel. Because he did not smell any alcohol on Richter's breath, Ruiz decided to administer field-sobriety tests to determine whether Richter might be under the influence of prescription drugs. Ruiz testified that Richter had a difficult time following directions during his administration of the horizontal-gaze nystasmus (HGN) test, which yielded six clues of intoxication. Ruiz' testimony and the recording of the walk-and-turn and one-leg-stand tests both demonstrate Richter's horrible performance. Based on Richter's performance on the field-sobriety tests, Ruiz determined that she did not have the normal

---

[2]The recording was made from a camera affixed to Ruiz' person.

[3]Richter made a global hearsay objection to the recording, which was overruled.

5

use of her mental and physical faculties as a result of her ingestion of prescription medication. Nevertheless, because "she was very depressed," Ruiz decided not to arrest Richter so long as she agreed to get medical help. Castillo arrived on the scene, and the video recording showed that he told Ruiz that he and Richter had recently engaged in a heated argument, that Richter was on many medications, and that she had taken many pills.[4]

Richter was transported to the hospital. Thomas R. Gordon, a registered nurse, testified that he was working at Ennis Regional Hospital when Richter arrived. Gordon testified that Richter's vital signs, including her pulse, blood pressure, and body temperature, were "very good" and that he "would call them the vital signs of maybe an athlete." Richter's medical records described her as alert, awake, and oriented; noted that her heart rate and eyes appeared normal; noted that her pupils were "equal, round, and reactive to light and accommodation"; and listed the medications that had been prescribed to Richter, including an opiate. The records also indicated that Richter had sustained neck injury and pain, but noted that she had neck pain and right knee pain before the accident "due to domestic violence recently." According to Gordon, Richter said that "she had been beat[en] up by her boyfriend."

A urine drug screen showed that Richter was negative for all screened drugs, except for an unknown amount of opiate. Dwain Fuller, the technical director of a toxicology laboratory and a forensic toxicologist, testified that the urine drug screen was an amino acid test meant for medical diagnostic use only. Fuller explained that because the amino acid tests can result in false positive indications for the presence of opiates, they require confirmation by another more specific method

---

[4]Richter denied the veracity of Castillo's statements to Ruiz.

of testing prior to use for legal purposes. He pointed to the test results, which contained the notation "[u]nconfirmed screening results should not be used for non-medical purposes." He testified, "[Y]ou can't even tell if it's really truly positive . . . since it's not confirmed." Fuller also added that codeine can be picked up for "about two to four days after the last use in the urine" and that he found no other evidence in the medical records demonstrating that she was intoxicated.

The record indicated that Richter's medication was prescribed to her for the treatment of arthritis, back pain, and anxiety. Richter's ex-husband, Curt Richter, testified that he was married to Richter for almost eight years and was familiar with her physical ailments. He testified that Richter was hit by a drunk driver before they were married and sustained a lower back injury which caused her to experience pain in her lower back. Curt also testified that Richter also suffered from arthritis and would sometimes struggle with day-to-day tasks, including getting out of bed. Castillo also testified that she had rheumatoid arthritis and back problems. Richter explained that she experienced complications with walking and moving around.

Richter also claimed that her medications did not cause her to have the collision in her car and that she had only taken Tylenol-Codeine on the day before the accident. She attributed the accident to exhaustion and emotional stress caused by a fight with Castillo. Both Richter and Castillo testified that they had a heated argument on the day before the accident, resulting in Richter calling the police. According to Richter, she and Castillo continued the argument throughout the day by telephone, and this continued conflict led her to conclude to leave Castillo. Curt testified that Richter called him a few hours before the accident and that although her voice sounded as if she were under stress, her voice sounded otherwise normal. As a result of that

7

conversation, Curt told Richter that she could stay with him if she needed to do so. Richter packed her clothes and her medications to prepare for her trip to Curt's house in San Antonio. Richter testified that she stopped at a gasoline filling station to charge her telephone. Because she had not slept much the preceding two days, she took a nap in her car while the telephone was charging inside. After her nap, she began driving on Interstate 45. Richter testified that, although tired, she was arguing with Castillo and crying on the telephone when she lost control of the vehicle and crashed into the guardrail. Richter then attempted to explain her poor performance on the field-sobriety tests by attributing her performance to the fact that her head had been struck by the airbag during the car crash and that she was in pain during the walk-and-turn and one-leg-stand tests.

To counter Richter's explanation, Ruiz testified that based on his experience, Richter's disorientation was not the result of the accident. He noted that Richter lodged no complaint to him of a head injury or of experiencing pain from a collision with the air bag.

The State also called Henry who evaluated the accident case reports, medical reports, and audio/video recording of Ruiz' encounter with Richter and Castillo. Henry mentioned that Richter had performed poorly on the walk-and-turn and one-leg-stand tests and noted that the HGN test reflected clues of intoxication. He went on to comment that Richter's medical charts recorded that her pulse rate was sixty-seven beats per minute, her blood pressure was "104 over 66 and 102 over 61," her body temperature was ninety-seven degrees Fahrenheit, and her urinalysis tested positive for opiates. Henry testified that he had concluded that this data suggested that "something [was] depressing her central nervous system" and that it was "possible that she [was] on CNS depressants

8

or narcotic analgesics" (either of which would severely inhibit her ability to operate a vehicle safely).

Gordon testified that without a baseline, he did not consider Richter's blood pressure to be depressed. He pointed to her "very good" vital statistics and testified that based on her urine screen, there were no depressants or benzodiazepines like Clonazepam or Lorazepam in her system. Gordon and Fuller testified that the only drug reflected in the urine screen was an opiate, and the record reflects that Tramadol and codeine are opioids.[5] Richter claimed that she had only taken Tylenol-Codeine, and Fuller added that Tramadol does not cause someone using that drug to experience a problem that would give symptoms of intoxication during an HGN test.

### C.    Sufficient Evidence Supports the Trial Court's Finding

This evidence created conflicting inferences with which the trial court struggled, as evidenced by his statement:

> And [the State] ha[s] absence of any positive proof medically that the CNS depressants or tramadol, depending on how you classify that, was present in her system through the medical records. And I don't recall [the State] eliminating those issues with [Henry,] the DRE expert[,] to see whether he still had an opinion if those elements were determined to be either unreliable or minimized.

Nevertheless, the trial court stated, "I can't explain your condition that's depicted on the video by simply saying that it was a result of anxiety and depression, and motor vehicle accident." The trial court ruled and reasoned as follows:

> And so based on the observations I made from the video, and discounting the DRE expert because of his unreliable foundation for some of his conclusions, and then it being contraindicated on the lab report, can't rely in total for all of his opinions.

---

[5]Fuller testified that Tramadol would not be covered by the drug screen.

9

Nevertheless, I conclude that you were operating a motor vehicle under the influence of the drugs and that it did contribute to the causing of the accident. And there's certainly some reasons that you may want to complain about that decision, but even after I discount the HGN, and take that out of my considerations, I take out the factors that your attorney complained of that -- and I -- the expert that you provided saying that it's unreliable, and you can't make a positive finding just based upon the lab results that you were intoxicated. I firmly believe that. That's what makes it more difficult because there's insufficient information. But there's also insufficient information provided to say you were not intoxicated. It's just not enough information either way.

And so then that puts me back to what is -- what can be directly observed from the videotape and your conduct on the videotape at the officer's car, at your car, and in the ambulance leads me to believe -- and on the roadside when you were performing the tests you weren't -- you weren't stable on your feet. You weren't -- you did not have good balance. There were times when your eyes were not really being controlled when you were making statements. Certainly not like you've been throughout the trial, being able to be focused, and conversant, and understanding what's going on.

And so I believe that those drugs did have some impact on you that night. And so, understand you may wish to disagree with that, but I think there's enough evidence there to show that . . . you were intoxicated. And so I'm finding you guilty of the offense of driving while intoxicated.

After reviewing the recording of Ruiz' encounter with Richter and Castillo, we agree with the trial court's ruling. That recording contains evidence that Richter's speech was pronouncedly slurred, that her eyes had a glassy look, and that she appeared disoriented. Although she denied several times having been in any kind of pain, Richter miserably failed the walk-and-turn and one-leg-stand field-sobriety tests. As demonstrated by the recording, Richter could not provide Ruiz with a straight answer regarding how many medications she had ingested before the accident, and she appeared, at times, to give conflicting answers to such questions. Three separate prescription medications were found in her purse, and two of those medications contained a label warning that

10

the medication should be taken at bedtime. Although Richter argued that her behavior could have been explained by injuries she might have sustained during the accident, her medical records indicated that she sustained no such injuries to her head or her face and that she was alert and oriented several hours after the accident.

Considering all of the evidence and the reasonable inferences therefrom, in the light most favorable to the verdict, we conclude that a rational fact-finder could have found, beyond a reasonable doubt, that Richter operated a motor vehicle in a public place while intoxicated. Accordingly, we overrule Richter's first point of error.

## II.    No Abuse of Discretion in Admitting Henry's Testimony Has Been Shown

Next, though the weight of Henry's testimony was discounted by the trial judge, Richter argues that the trial court erred in admitting his expert testimony. "We review the admission of evidence under an abuse of discretion standard." *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (citing *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)). "As long as the trial court's ruling was at least within the zone of reasonable disagreement, an appellate court should not intercede." *Gentry v. State*, 259 S.W.3d 272, 279 (Tex. App.—Waco 2008, pet. ref'd).

As explained in *Vela v. State*,

> The Texas Rules of Evidence set out three separate conditions regarding admissibility of expert testimony. First, Rule 104(a) requires that "[p]reliminary questions concerning the qualification of a person to be a witness . . . be determined by the court. . . ." Second, Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." And third, Rules 401 and 402 render testimony admissible only if it

11

"tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

These rules require a trial judge to make three separate inquiries, which must all be met before admitting expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance.

*Vela v. State*, 209 S.W.3d 128, 130–31 (Tex. Crim. App. 2006) (citations omitted); *see Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). Richter argues that Henry was not qualified to render an expert opinion on whether she was intoxicated and that the information he relied on was not reliable.

The State listed Henry as an expert "[t]rained to identify people whose driving is impaired by drugs; specialized training in SFST's [standard field-sobriety tests], trained to distinguish the drug categories, and trained on how drugs affect a person's ability to operate a motor vehicle." An expert witness must have a sufficient background that "goes to the very matter on which [the witness] is to give an opinion." *Vela*, 209 S.W.3d at 131. "'The special knowledge which qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things a witness . . . .'" *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (quoting *Penry v. State*, 903 S.W.2d 715, 762 (Tex. Crim. App. 1995)); *Holmes v. State*, 135 S.W.3d 178, 182 (Tex. App.—Waco 2004, no pet.). While the party proffering the expert witness bears the burden of showing that the witness is qualified on the specific matter in question and that he "possess[es] some additional knowledge

12

or expertise beyond that possessed by the average person, . . . the gap need not necessarily be monumental." *See Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010) (citing *Rodgers*, 205 S.W.3d at 527–28). "An expert witness's knowledge or experience about an issue must only exceed that of an average juror." *Holmes*, 135 S.W.3d at 182.

Henry was offered as an expert in determining whether a person was intoxicated by a substance other than alcohol. He testified that he had been a state trooper for three years, was certified in the interpretation of standard field-sobriety tests, and was certified as a drug recognition expert in September 2014. Henry explained the process required to become a drug recognition expert, which began when he was selected by his department to apply for the "school through Sam Houston State." Once accepted, Henry attended a three-day course to demonstrate proficiency during field-sobriety testing and a ten-day educational course that "teach[es] you everything you need to know to become a drug recognition expert in a classroom setting[,] . . . [including] human anatomy and physiology, the seven drug categories, [and] the 12-step process that we use to evaluate persons." He testified that he received training on different types of drugs, including prescription medications, and the way they affect the human body. After passing the classroom tests, Henry completed the field certification, in which he tested live subjects under the influence of an unknown drug to determine the drug type influencing them. Henry passed the final knowledge examination administered by the International Association of Chiefs of Police.

During voir dire, Henry admitted that he had not taken any toxicology, pharmacology, or neurology classes and that he did not have a degree in chemistry or any medical training. At trial, Richter argued,

13

He's only stated that he's had this DRE certificate since September. This offense happened in February. He's only been a law enforcement officer for three years. I would argue that his three years of experience, coupled with a certificate in September, not having had any more street experience, more training on the matter, it does not qualify him as a DRE expert.

This argument appears better suited for discussing the weight to be given Henry's testimony. In light of this record, we find no abuse of discretion in the trial court's determination that Henry possessed knowledge beyond that of the average person in determining if prescription medication caused intoxication.

Richter also lodged objections as to the reliability of Henry's opinions, as shown below:

Q.  Do you believe you can also evaluate and look over another officer's DWI stop and based on their standard field sobriety tests and based on medical factors, that you can make a determination whether the person was under the influence of certain drugs?

[BY THE DEFENSE]:  Judge, I'm going to object to that particular question, Judge. The witness testified as to conduct that he does. It's for his practice out there. He never talked about him being used as peer review. Any of that testimony that he's testified before just looking at other matters, I'm going to object to that line of questioning and further testimony of this witness as relevant.

[BY THE STATE]:  Your Honor, I was just asking if that is something that he feels comfortable with in his line of work.

THE COURT:  Overruled.

After this exchange, Henry elaborated that part of his training included forming opinions based on "given data" versus first-hand observation of a subject. Henry then testified that he reviewed the recording, the medical records, and the case reports in formulating an opinion as to whether Richter was intoxicated. Richter then replied, "Objection, Your Honor. The witness is testifying on unreliable, unscientific records. We'd object to his testimony. We'd object to him as relevant."

14

After the trial court overruled the objection, Henry stated his opinion that Richter was driving while intoxicated. At the conclusion of Henry's testimony, after Henry testified that "[he] just trusted that the medical equipment used was accurate," Richter renewed her "objection to strike Trooper Henry's testimony as not having reliable information in front of him . . . [because] the records he looked at were not scientifically reliable enough for him to take into consideration."

In *Nenno v. State*, "the Texas Court of Criminal Appeals stated 'an appropriately tailored translation of the . . . test' for expert testimony" outside the hard sciences. *Hardin v. State*, 20 S.W.3d 84, 91–92 (Tex. App.—Texarkana 2000, pet. ref'd) (quoting *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999)). As explained in *Hardin*,

> When the expert is from a [discipline which] involve[s] technical or other specialized knowledge, experience, and training as opposed to the scientific method, the test for reliability is: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies on and/or utilizes the principles involved in the field.

*Id.*

The field of drug recognition has been noted by some Texas courts as a recognized field. *See Wooten v. State*, 267 S.W.3d 289, 302 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Bumgarner v. State*, No. 12-05-00243-CR, 2006 WL 1917961, at *4 (Tex. App.—Tyler July 12, 2006, pet. ref'd *and* pet. ref'd) (mem. op., not designated for publication) ("Because the range of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case.")); *see Everitt v. State*, No. 01-10-00504-CR, 2014 WL 586100, at *4–

15

5 (Tex. App.—Houston [1st Dist.] Feb. 13, 2014, no pet.) (mem. op., not designated for publication); *Armstrong v. State*, No. 05-10-01214-CR, 2012 WL 864778, at *3 (Tex. App.—Dallas Mar. 15, 2012, no pet.) (not designated for publication).[6] Although Henry had not become a drug recognition expert at the time of Richter's accident and charge, he was certified as a drug recognition expert prior to the time he evaluated Richter's file and eight months prior to trial. Henry had previously testified as a drug recognition expert, and the subject matter of his testimony was within the scope of this field. Henry testified that he was trained to use given data to determine whether a person was under the influence of drugs and explained in detail the methodology used by drug recognition experts, which he utilized in formulating his opinions.[7] Accordingly, we cannot say that the trial court abused its discretion in allowing Henry's testimony.[8] We overrule Richter's second point of error.

---

[6]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

[7]Richter complains that Henry did not use all of the steps drug recognition experts use when they are in a position to evaluate a subject personally, such as conducting a breath test, determining whether there is an odor of alcohol, conducting a physical examination of the subject, personally conducting HGN and other field-sobriety tests, and interviewing other officers on scene. Because alcohol was not a factor in the accident and Henry was not present on the scene, these steps typically used by drug recognition experts did not apply. However, Henry explained that drug recognition experts are trained to determine whether a person is intoxicated by reviewing given data (data which he had employed).

[8]Richter argues that some of Henry's conclusions were faulty due to his reliance on the urine screen and his assumptions about her vital statistics. To the extent that Richter made these arguments, the trial court agreed and commented that he was discounting some of Henry's conclusions due to "unreliable foundation," and was instead relying on the recording. Given these comments, even if we were to assume error in the admission of Henry's testimony, Richter would be hard-pressed to demonstrate harm under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(b).

**III.** **The Trial Court Did Not Abuse Its Discretion in Overruling Richter's Hearsay Objections**

In her last point of error, Richter contends that the trial court erred in overruling her global hearsay objection to the recording because it contained Ruiz' statement, "I just talked to her . . . boyfriend. She's taken a lot of pills." The recording of Ruiz' encounter with Richter and Castillo was lengthy and included admissible evidence. When the State offered it into evidence, Richter lodged a global hearsay objection without specifying which portions of the recording were objectionable. "'The trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or exclude only the latter part.'" *Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009) (quoting *Jones v. State*, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992)). Instead, "'the trial court may safely admit it or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.'" *Id.* (quoting *Jones*, 843 S.W.2d at 492). Thus, by making a global objection, Richter failed to preserve any error in the admission of any portion of the recording. *Whitaker*, 286 S.W.3d at 369 ("[A]ppellant's trial objections were insufficient to preserve any error in the admission of any portion of the audiotapes because these objections did not specifically point out which portions of the audiotapes were objected to as inadmissible. *See Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Cr[im]. App. 1980) (op. on reh'g) ("when evidence is admitted, a part of which is admissible and a part of which is not, it is incumbent on the party objecting to the admissibility of the evidence

17

to specifically point out what part is inadmissible to preserve the alleged error . . . ) . . . ; *see also Human v. State*, 749 S.W.2d 832, 838 (Tex. Cr[im]. App. 1988) . . . .").

Next, Richter also argues that the trial court erred in overruling her hearsay objections to Ruiz' testimony during the following exchange:

> Q.      And were you able to speak with Mr. Castillo?
>
> A.      Yes, sir.
>
> Q.      And what did he tell you?
>
> A.      He stated that --
>
> [BY THE DEFENSE]:  Objection to hearsay.
>
> [BY THE STATE]:  Your Honor, at this time, those statements from Mr. Castillo aren't being used for the truth of the matter but rather to assist the Court in what Mr. Ruiz was doing in his investigations.  Mr. Castillo's actually here to testify in his own words as to whether those statements are true or not.  So at this time, Your Honor, I don't believe the State's eliciting these statements to prove the truth of the matter.
>
> THE COURT:  Give me a temporal context when the statements were made.
>
> [BY THE STATE]:  On scene --
>
> THE COURT:  Well, through the witness.  Ask the witness when the statements were made, as far as, if it's not going to the truth of the matter asserted, then there has to be some other reason it's being offered.  So I need to know.
>
> Q.      [BY THE STATE] Officer Ruiz, why did you speak with Mr. Castillo?
>
> A.      Ms. Richter had called Mr. Castillo while she was there at the, in the vehicle and he had showed up.

18

Q. And did you actually speak with him on the phone right when you encountered Ms. Richter?

A. Yes, I did.

Q. And how did you come across speaking to him on the phone?

A. He wanted to know where she was at.

Q. And did you explain to him where she was?

A. Yes, sir, I did.

Q. And what other, I guess, what other parts or what other statements happened in this conversation on the phone?

[BY THE DEFENSE]: Objection to hearsay.[9]

THE COURT: Overruled.

THE WITNESS: He had stated that they had a fight earlier that day, that she had called the PD at their house and tried to get him in trouble for assault family violence and that she had left and that she had called him several times stating that she was going to take all her pills.

To support her position that this ruling was in error, Richter points to a similar objection she made

which was sustained by the trial court, as demonstrated below:

Q. And why were you speaking with him?

A. He came to the scene and wanted to check on her and he had told me -- he stated again --

[BY THE DEFENSE]: Objection to hearsay.

THE WITNESS: -- that she had taken a lot of medications.

THE COURT: I'm going to sustain that objection.

---

[9]This appears to have been an objection made in anticipation of what Richter believed would likely have been a response because no such hearsay had yet been uttered. No objection was made to the response.

19

"Hearsay is a statement . . . other than one made by the declarant while testifying at the trial, which is offered to prove the truth of the matter asserted." *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) (citing TEX. R. EVID. 801(d)). "An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Id.* Thus, statements offered to explain how a defendant came to be a suspect of a crime are not hearsay. *Id.*; *see Powell v. State*, 151 S.W.3d 646, 653 (Tex. App.—Waco 2004), *rev'd on other grounds*, 189 S.W.3d 285 (Tex. Crim. App. 2006); *Kimball v. State*, 24 S.W.3d 555, 564 (Tex. App.—Waco 2000, no pet.); *Cano v. State*, 3 S.W.3d 99, 110 (Tex. App.—Corpus Christi 1999, pet. ref'd).

Here, the State established that Ruiz spoke to Castillo immediately after arriving on the scene of the accident. His conversation with Castillo led him to believe that this was not a normal accident scene, led him to suspect that Richter was intoxicated, and caused him to focus his investigation on the suspected intoxication. Because Castillio's statements to Ruiz were not admitted to prove (1) that he and Richter "had a fight earlier that day," (2) "that she had called the PD at their house and tried to get him in trouble for assault family violence," or (3) "that she had left and . . . stat[ed] that she was going to take all her pills," we cannot say that the trial court abused its discretion in overruling Richter's hearsay objection. *See Dinkins*, 894 S.W.2d at 347; *Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim. App. 1992), *abrogated on other grounds by*

20

*Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App. 2001); *Powell*, 151 S.W.3d at 653; *Kimball*, 24 S.W.3d at 564.[10]  We do not believe this to have been hearsay.

We also note that this was a bench trial and not a jury trial.  In a trial before a court, it is presumed that the judge ignores improper testimony.  *Ozack v. State*, 646 S.W.2d 941, 943 (Tex. Crim. App. 1983).  Consequently, if this had been improperly admitted, any such error would have been harmless.

Accordingly, we overrule Richter's last point of error.

## IV.    Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:      December 8, 2015
Date Decided:        December 22, 2015

Publish

---

[10]Moreover, the recording included statements from Ruiz indicating that Castillo said that Richter had taken a lot of pills.  It also included Castillo's conversation with Ruiz in which he discussed their previous fight, police involvement, and that she had taken many pills.  This was the same information provided by Ruiz in response to the State's question of "what other parts or what other statements happened in this conversation on the phone."