

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00154-CR

LLOYD ADAM TOLER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. CR2100144

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Hunt County jury convicted Lloyd Adam Toler of driving while intoxicated (DWI), and he was assessed a sentence of 180 days' confinement. On appeal, Toler challenges the sufficiency of the evidence supporting his conviction. We find sufficient evidence supports the jury's finding. Because the judgment requires modification, we will affirm the trial court's judgment, as modified.

## I.    The Evidence at Trial

Hunt County Deputy Sheriffs Sam Stephens and Eddie Wade Jones responded to a report of a reckless driver on Interstate 30 in the vicinity of Caddo Mills around 11:00 p.m. on September 11, 2020. The recording from the deputies' dash camera showed that, when the pickup driven by Toler was first observed on the south service road of Interstate 30, it swerved into the left, oncoming-traffic lane, then swerved back into the right lane as an oncoming automobile approached. After the oncoming automobile passed, Toler's pickup returned to the oncoming-traffic lane for around ten seconds, swerved back into the right lane briefly, then returned to the oncoming-traffic lane. At that point, the deputies engaged their overhead lights to pursue Toler's pickup. Toler then swerved to the left, grassy shoulder, where he drove for around ten seconds, then swerved across the oncoming-traffic lane and into the right lane. Toler then rolled to a stop in the right lane.

As the officers approached the stopped vehicle, Toler opened the driver's side door. After a short conversation, the pickup began moving forward, and Jones reached into the pickup, engaged the emergency brake, and turned the engine off. When Toler exited the pickup, he

2

stumbled, and the officers assisted him to the side of the bed of the pickup, on which he leaned for support. As he talked with the officers, Toler's body swayed from side to side. Throughout the stop, Toler had difficulty walking and standing, stumbled at times, and almost fell. Eventually, he laid down on his back on the roadway, straddling the right lane and the shoulder. At one point, Toler placed a cigarette in his mouth backward and attempted to light the filter.

The deputies testified that Toler was lethargic, slow to respond, and very slow to answer questions and that he had slurred, incoherent speech. Jones testified that Toler also thought that he was in Greenville, rather than near Caddo Mills. Toler denied consuming alcohol but told Stephens that he had taken too much of his prescription pills. Toler told them that he took medication for bipolar disorder, schizophrenia, and depression. Both officers opined that Toler had lost the normal control over his physical faculties because of his inability to keep his balance, his tendency to fall, his inability to walk without assistance, and his lack of simple motor skills. They also opined that he had lost the normal control over his mental faculties because of his inability to remember, his delayed responses to simple questions, and his confusion as to where he was. Because they suspected Toler was driving while intoxicated, the deputies contacted the Texas Department of Public Safety (TDPS) to conduct a DWI investigation.

TDPS Trooper Greg Joyner testified that he was called to assist the deputies with a reckless, and possibly impaired, driver. After talking with the deputies, Joyner approached Toler, who was laying on his back in the roadway. As he talked to him, Toler's eyes were closed. Joyner described his speech pattern as extremely slow and thick-tongued. Toler told

3

Joyner that he had taken too much of his medications for bipolar disorder and schizophrenia and that he also took anti-depressants, including Seroquel. At one point, Toler stated that he was trying to have some fun. Joyner performed a horizontal gaze nystagmus field sobriety test on Toler after he was placed in an ambulance. Toler exhibited six out of six clues of intoxication.[1] Joyner opined that Toler was intoxicated and that he had lost the normal use of his physical and mental faculties based on the deputies' description of the traffic stop and Toler's driving behavior; Toler's laying lethargic on the street, red eyes, dilated pupils, and speech pattern; and the clues observed in the HGN test. After Toler was taken to a hospital, Joyner obtained a blood specimen from him at 1:09 the following morning.

Taylor Schwartz, a forensic scientist at the TDPS Crime Laboratory in Tyler, analyzed Toler's blood specimen for the presence of alcohol. She determined that the specimen had 0.025 grams of alcohol per 100 milliliters of blood. Although she could not say whether Toler was impaired without more information, she opined that it is possible that a person could be impaired below 0.08 grams per 100 milliliters.

Dana Baxter, a forensic scientist at the TDPS Crime Laboratory in Austin, analyzed Toler's blood specimen for the presence of drugs. She testified that, in her initial test for the presence of ten broad categories of drugs, including such substances as amphetamine, barbiturates, and opiates, none were detected. She also performed a target qualitative test because the TDPS trooper had listed Seroquel as a suspected drug. Baxter explained that the test

---

[1]The jury also viewed a recording from Joyner's body camera that showed Joyner's interaction with Toler in the roadway and in the ambulance, which was consistent with Joyner's testimony.

performed for the presence of Seroquel also tests for the presence of twenty-four other drugs, including citalopram. When this test was performed, the presence of citalopram was detected.

Baxter explained that the test for those twenty-five drugs will not yield the amount of any drug in the system because they set the cutoff at the low end of the therapeutic range that a physician would prescribe for his patient. As a result, it is at a concentration that can affect a person. She explained that, if a doctor prescribes anti-anxiety medicine, then the therapeutic range is enough to treat the patient's anxiety.

She also testified that citalopram is prescribed for depression and that it affects the body by elevating the mood to lessen the depression. She noted that some possible side effects were dizziness, drowsiness, and slowed reaction times. Baxter testified that the warning label for citalopram says to avoid drinking alcohol while taking it because it can increase the effects of alcohol. She opined that citalopram's side effects of dizziness, drowsiness, and slowed reaction times could be increased if taken with alcohol. She also opined that a person could lose their mental or physical faculties while in the therapeutic range of the drug.

Baxter acknowledged that impairment cannot be based solely on her laboratory report. She also acknowledged that she did not know whether Toler experienced the drug's side effects.

## II.     Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.

Crim. App. 2010) (plurality op.)). "Our rigorous legal sufficiency review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the

6

evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based on an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)). "We may not re-weigh the evidence or substitute our judgment for that of the fact [-]finder." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Id.* at 733 (quoting *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). "Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016)).

## III. Analysis

Toler challenges the sufficiency of the evidence to support his conviction for driving while intoxicated. "A person commits Class B misdemeanor DWI if the person is intoxicated while operating a motor vehicle in a public place." *Ramjattansingh v. State*, 548 S.W.3d 540,

7

548 (Tex. Crim. App. 2018) (citing TEX. PENAL CODE ANN. § 49.04(a), (b)). As applied in this case, "'[i]ntoxicated' means . . . not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, [or] a combination of two or more of those substances . . . into the body." TEX. PENAL CODE ANN. § 49.01(2)(A). Under the statute and the information, in order to convict Toler of DWI, the State had to show, beyond a reasonable doubt, that Toler, (1) while operating a motor vehicle (2) in a public place, (3) did not have the normal use of his mental or physical faculties (4) by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, or a combination of two or more of those substances into his body. *See* TEX. PENAL CODE ANN. § 49.01(2)(A), § 49.04(a) (Supp.). Toler does not challenge the sufficiency of the evidence that he did not have the normal use of his mental or physical faculties while operating a motor vehicle in a public place. He only challenges the sufficiency of the evidence that he was intoxicated by reason of the introduction of alcohol, a drug, or a combination of those substances. Toler argues that, because Baxter could not identify the amount of citalopram that was in his blood, could not identify how the known side effects of the drug specifically affected him, and could not testify that he was intoxicated solely on the results of the test she performed, there was no evidence that his intoxication was a result of the introduction of alcohol and citalopram into his body.

The DWI statute contains two theories of intoxication. *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010). One is the per se theory, that is, "having an alcohol concentration of 0.08 or more." TEX. PENAL CODE ANN. § 49.01(2)(B). To support a conviction for DWI under this theory, the State must show that the defendant's alcohol concentration was at least

0.08 at the time he was operating a motor vehicle, either by expert retrograde extrapolation testimony or by the introduction of other evidence "that would support an inference that the defendant was intoxicated at the time of driving." *Kirsch*, 306 S.W.3d at 745–46. This evidence "includes, *inter alia*, erratic driving, post-driving behavior such as stumbling, swaying, slurring or mumbling words, inability to perform field sobriety tests or follow directions, bloodshot eyes, . . . in short, any and all of the usual indicia of intoxication." *Id.* at 745. This theory of intoxication focuses on both the intoxicant, alcohol, and the amount of that intoxicant's concentration. Nevertheless, indirect evidence of the defendant's intoxication will support a conviction under the per se theory of intoxication. *Id.* at 746

The other theory of intoxication is the "impairment" theory. *Id.* at 743. The impairment theory, which is applicable to this case, "focuses on the state of intoxication, not on the intoxicant." *Ouellette v. State*, 353 S.W.3d 868, 869 (Tex. Crim. App. 2011) (citing TEX. PENAL CODE ANN. § 49.01(2)(A)). Under this theory, "the substance that causes intoxication is not an element of the offense." *Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004). Rather, the intoxicant "is an evidentiary matter." *Id.* However, there must be some evidence that the intoxicant, or a combination of intoxicants, can cause symptoms indicative of intoxication and some evidence from which the jury can reasonably infer that the intoxicant, or a combination of intoxicants, caused the symptoms displayed by the defendant. *See Ouellette*, 353 S.W.3d at 870; *Burnett v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017) ("The jury is permitted to consider whether a defendant was intoxicated from 'any other substance' when there is evidence that the defendant ingested a substance that caused him to become intoxicated or there is sufficient

9

evidence for a rational juror to infer such."). Nevertheless, expert testimony of the amount of intoxicant in the defendant's blood, or how the known side effects of the intoxicant specifically affected him, is not required.[2]

In *Ouellette*, the defendant was charged with DWI "'by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, or a combination of two or more of those substances into the body.'" *Ouellette*, 353 S.W.3d at 869. At the time of her arrest, the defendant exhibited physical signs of intoxication and had the odor of alcohol on her breath. *Id.* The arresting officer found a bottle of pills in the defendant's vehicle containing Soma and testified "that both alcohol and Soma [were] central nervous system depressants." *Id.* at 870. In upholding the judgment of conviction, the Texas Court of Criminal Appeals held that, "[a]lthough there was no direct evidence that the defendant consumed the drug, there was evidence from which a rational juror could have found that the defendant did so." *Id.* Thus, even in the absence of evidence of the amount of intoxicants in a defendant's blood, the evidence can be sufficient to show the intoxication was caused by the introduction of the intoxicants into the defendant's body.

In *Richter v. State*, Richter was involved in a one-car accident around 4:00 a.m. Responding officers found her in the driver's seat and testified that she was glassy-eyed, had slurred speech, and was disoriented. *Richter v. State*, 482 S.W.3d 288, 291 (Tex. App.—

---

[2]Under either theory of intoxication, the results of a test of the defendant's blood specimen, without more, would be insufficient to show the defendant was intoxicated at the time she was driving. Although the laboratory results may be "highly probative to prove both per se and impairment intoxication," the evidence must also "include[] either (1) expert testimony of retrograde extrapolation, or (2) other evidence of intoxication that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test." *Kirsch*, 306 S.W.3d at 745–46.

10

Texarkana 2015, no pet.). Richter was in possession of several prescription medications and admitted that she took two Tramadol for pain, something for anxiety, and some other pills before the accident. *Id.* The evidence showed that Richter yielded six clues of intoxication on the HGN test and performed poorly on the other two field sobriety tests. "A urine drug screen . . . was negative for all screened drugs" but indicated "an unknown amount of opiate." *Id.* at 292. A state trooper, who was a drug recognition expert, reviewed the accident reports, medical reports, and the recording of the officers' encounter with Richter at the accident scene and opined that the medical records "suggested that 'something [was] depressing her central nervous system' and that it was 'possible that she [was] on CNS depressants or narcotic analgesics' (either of which would severely inhibit her ability to operate a vehicle safely)." *Id.* at 290, 293 (alterations in original). Based on this evidence, we held that a reasonable fact-finder could have found that Richter operated a motor vehicle while intoxicated.[3] *Id.* at 295.

Our sister courts have also found sufficient evidence of intoxication by alcohol, drugs, or a combination of those causing intoxication even in the absence of evidence of the concentration of the drugs in the defendant or direct testimony of how the drugs specifically affected him. In *Crouse v. State*, officers stopped Crouse after observing erratic driving behavior. *Crouse v. State*, 441 S.W.3d 508, 510 (Tex. App.—Dallas 2014, no pet.). On questioning, he was confused and disoriented, his speech was slurred, his eyes were dilated, and he did not know where he was or what day it was. Crouse told the officers that he had been in the hospital that day for chronic back pain and a depression check when they asked about medical release papers on the front seat

---

[3]Richter was charged under the impairment theory of intoxication. *See Ritcher*, 482 S.W.3d at 291.

of the car. *Id.* The release papers listed all his medications, all of which had warnings regarding dizziness that could affect the operation of a motor vehicle, and some of which warned that they could cause drowsiness when taken with alcohol or other kinds of medication. The officers also observed six clues of intoxication while administering standardized field sobriety tests. *Id.* at 511. Laboratory results of Crouse's blood specimen showed that he had 0.006 milligrams of alprazolam per liter, 0.02 milligrams of lorazepam per liter, an unquantified amount of cyclobenzaprine, and an unquantified amount of mirtazapine. *Id.* There was also evidence that he had received intravenous morphine at the hospital a few hours before the traffic stop and that he had taken Depakote and Neurontin the morning before the stop. *Id.* at 511–12. Crouse's expert opined that the combination, timing, and level of medications he took would not cause Crouse to not have the normal use of his mental or physical faculties. However, she acknowledged that warnings not to operate a motor vehicle were associated with the use of morphine, testified the morphine could have affected him, and testified that she did not know whether his prescription medications also affected him. She also testified that the Depakote and Neurontin could have negatively affected his performance on the HGN portion of the standardize field sobriety test. *Id.* at 512.

Regarding the evidence that supported whether a combination of drugs caused Crouse's intoxication, the Dallas court noted that Crouse admitted that he took numerous prescription drugs, that the drugs had potential side effects of dizziness and inability to operate motor vehicles, and that his expert "admitted the drugs could have an effect on some people, and she had no personal knowledge of whether any of appellant's prescription medications affected him

12

in this manner." *Id.* at 514. It also pointed to the evidence that showed Crouse had been given morphine and a muscle relaxant while in the hospital, that both carried warnings against operating a motor vehicle, and that they could cause drowsiness. *Id.* Based on this evidence, the court of appeals held that the fact-finder could reasonably find that Crouse's loss of the "normal use of his mental or physical faculties result[ed] from the introduction of a drug or combination of drugs." *Id.* at 515.

In *Crouse*, the Dallas court cited the opinions of several other courts of appeals that have found sufficient evidence of intoxication by the introduction of a drug or a combination of drugs without a showing of the quantity of drugs present in the defendant's blood stream or how they specifically affected the defendant. *Id.* at 513–15 (citing, *inter alia*, *Delane v. State*, 369 S.W.3d 412, 418 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *Landers v. State*, 110 S.W.3d 617, 620–21 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *Paschall v. State*, 285 S.W.3d 166, 177–78 (Tex. App.—Fort Worth 2009, pet. ref'd)). In *Paschall*, the Fort Worth Court of Appeals noted that the State only offered circumstantial evidence that Paschall's loss of the normal use of his mental or physical faculties was caused by the introduction of a drug or combination of drugs. *Paschall v. State*, 285 S.W.3d 166, 177–78 (Tex. App.—Fort Worth 2009, pet. ref'd). This evidence came from the testimony of a pharmacist who testified that two of the drugs that Paschall admitted to taking, Thorazine and Trazodone, were "central nervous system depressants that would cause a person intoxicated by use of the drugs to exhibit slurred speech, affected balance, abnormal gait, and constricted pupils and that it would be dangerous for a person so

13

intoxicated to drive." *Id.* at 178. This testimony, combined with the arresting officer's testimony "that Paschall exhibited slurred speech, swaying, and constricted pupils," was sufficient to allow the fact-finder to infer that his loss of the normal use of his mental or physical faculties was caused by the introduction of a drug or a combination of drugs. *Id.*

In this case, Baxter testified that Toler's blood specimen tested positive for the presence of citalopram, which is prescribed for depression. Even though Baxter could not identify the exact amount of citalopram in Toler's blood, she testified that the amount was in the therapeutic range and that a therapeutic amount can have an affect on the person taking it. She also testified that citalopram could cause dizziness, drowsiness, and slowed reaction times and that the warning label for this drug cautions not to drink alcohol because it can increase the effects of alcohol. She also opined that citalopram's side effects could be increased if taken with alcohol. The evidence also showed that Toler's blood specimen contained 0.025 grams of alcohol per 100 milliliters of blood. Finally, the evidence showed that Toler was stopped because he was swerving between his lane and the oncoming-traffic lane and drove in the oncoming-traffic lane and the grassy shoulder. When he was stopped, he was lethargic, slow to respond, and very slow to answer questions, and he had slurred, incoherent speech. Toler also showed signs of dizziness in that he had difficulty standing, stumbled at times, almost fell, and lay down on the roadway. Although Toler denied that he had drunk alcohol, he admitted that he had taken anti-depressants and, in his own estimation, perhaps too many.

Based on this evidence, we find that a reasonable jury could infer that Toler's loss of the normal use of his mental or physical faculties was the result of the introduction of alcohol and

14

citalopram into his body.  *See Richter*, 482 S.W.3d at 295; *Crouse*, 441 S.W.3d at 514–15; *Paschall*, 285 S.W.3d at 178.  For that reason, we find that sufficient evidence supports Toler's DWI conviction.  We overrule Toler's sole issue.

## IV.    Modification of Judgment

In the oral rendition of its judgment, the trial court noted that there was a fine of $3,100.00 associated with the DWI conviction.  The trial court then found that Toler was indigent and that he did not have the resources to pay or otherwise discharge the fine, and the court waived the fine.  Nevertheless, the written judgment contains an entry of "$3,100.00" under "Fines."  The judgment also indicates that $100.00 of the fine is for "EMS, Trauma Facilities and Trauma Care Systems Fine . . . (CCP, Art. 102.0185)"[4] and that $3,000.00 of the fine is for "DWI 1st (Transportation Code § 709.001)."[5]

Because fines are punitive and intended to be a part of the defendant's sentence, they "generally must be orally pronounced in the defendant's presence."  *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM. PROC. ANN. art. 42.03, § 1(a); *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004)).  When there is a conflict between the oral pronouncement of sentence in open court and the written judgment, the oral pronouncement controls.  *See Taylor v. State*, 131 S.W.3d 497, 502 (Tex. Crim. App. 2004) (citing *Thompson v. State*, 108 S.W.3d 287, 290 (Tex. Crim. App. 2003)).  "This Court has the

---

[4]*See* TEX. CODE CRIM. PROC. ANN. art. 102.0185(a) (Supp.).

[5]Section 709.001 of the Texas Transportation Code provides that, "[e]xcept as provided by Subsection (c), . . . a person who has been finally convicted of an offense relating to the operating of a motor vehicle while intoxicated shall pay a fine of: (1) $3,000 for the first conviction within a 36-month period."  TEX TRANSP. CODE ANN. § 709.001(b).  Subsection (c) provides that, if the trial court "makes a finding that the person is indigent, the court shall waive all fines and costs imposed on the person under [that] section."  TEX. TRANSP. CODE ANN. § 709.001(c).

power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record." *Anthony v. State*, 531 S.W.3d 739, 743 (Tex. App.—Texarkana 2016, no pet.) (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993)). "We have the authority to modify the judgment to make the record speak the truth." *Minter v. State*, 570 S.W.3d 941, 944 (Tex. App.—Texarkana 2019, no pet.) (citing TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992)). In this case, the trial court's oral rendition found that Toler was indigent, and pursuant to subsection (c) of Section 709.001 of the Texas Transportation Code, it waived the $3,000.00 fine provided in subsection (b) of that section. For that reason, we modify the judgment by changing the entry under "Fines" to "$100.00."

The record also shows that the trial court found Toler indigent before trial and appointed him counsel. Because he was found indigent, he was presumed to remain indigent absent proof of a material change in his circumstances. *See* TEX. CODE CRIM. PROC. ANN. arts. 26.04(p), 26.05(g) (Supp.); *Walker v. State*, 557 S.W.3d 678, 689 (Tex. App.—Texarkana 2018, pet. ref'd). Nevertheless, and even though the trial court found that Toler was indigent when it rendered its judgment, it stated at rendition that Toler's trial counsel would submit a bill for his fees and that those fees would be added to reimbursement fees. Under "Reimbursement Fees" the written judgment states "SEE BILL OF COSTS." The certified bill of costs includes a charge for "Court Appointed Attorney Fee" of $3,150.00, under "**ADDITIONAL REIMBURSEMENT FEES ASSESSED**."

16

Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of court-appointed attorney fees only if "the judge determines that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided . . . , including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees" of legal services provided. *Armstrong*, 340 S.W.3d at 765–66 (quoting *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)). Further, "[c]ourt costs, as reflected in a certified bill of costs, need neither be orally pronounced nor incorporated by reference in the judgment to be effective." *Id.* at 766–77 (citing *Weir v. State*, 278 S.W.3d 364, 367 (Tex. Crim. App. 2009)).

We have reviewed the appellate record and conclude that nothing showed that Toler had the ability to pay attorney fees. We also note that the trial court found Toler indigent in its rendition and in a subsequent order appointing him appellate counsel. As a result, we modify the certified bill of costs by deleting the charge for "Court Appointed Attorney Fee," changing the "**TOTAL REIMBURSEMENTS**" to $150.00, and changing the "**GRAND TOTAL**" to $570.00.

## V. Disposition

We modify the trial court's judgment by changing the entry under "Fines" to "$100.00." We modify the certified bill of costs by deleting the charge for "Court Appointed Attorney Fee,"

17

changing the "**TOTAL REIMBURSEMENTS**" to $150.00, and changing the "**GRAND TOTAL**" to $570.00.  We affirm the trial court's judgment, as modified.


Jeff Rambin
Justice

Date Submitted:     May 26, 2023
Date Decided:       June 16, 2023

Do Not Publish