**In The**

**Court of Appeals**

**Ninth District of Texas at Beaumont**

_____

**NO. 09-24-00061-CR**
_____

**LONNIE CARLSTON DAVIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F21-38487**

**MEMORANDUM OPINION**

A jury convicted Lonnie Carlston Davis for continuous sexual abuse of a young child and sentenced him to life imprisonment. *See* Tex. Penal Code Ann. § 21.02. Davis challenges his conviction in five issues. In two issues he challenges the admission of evidence at trial on grounds of hearsay and speculation. In three issues Davis challenges jury instructions that he could be convicted on less than a unanimous verdict, that he was denied due process by failure to require a unanimous verdict, and that the statute under which he was convicted is unconstitutional since

1

the jury was not required to return a unanimous verdict. We hold the trial court properly admitted the complained-of evidence and testimony and properly instructed the jury, so we overrule issues one through three. We hold that Davis failed to properly preserve his complaint in issues four and five. Accordingly, we affirm the trial court's judgment.

## Background

On September 29, 2021, a grand jury indictment alleges that Davis committed acts of continuous sexual abuse of a child, a first-degree felony, against "Zeb."[1] *See id.* The jury trial began in February 2024. The State's first witness was the victim's mother. Mother testified that she has three children and that Zeb is her middle child, born in 1999. Mother stated that she knew Davis since high school, but they became friends after high school. Davis was also friends with Mother's ex-husband and Zeb's dad. Mother described Davis as her "best friend" and testified that Davis moved to Austin, but when he moved back, they were together daily. Mother pointed out that Davis was homosexual, and although it was accepted, it was not something Davis discussed. Because of his sexuality, Mother knew that Davis was not interested in her romantically, and he felt safe as a friend.

---

[1] We use pseudonyms for the name of the child and his family members to protect their rights to privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

Mother testified that while living in a home on Fourth Avenue, she and Father often had parties that Davis attended because if Davis was in town, he would be at Mother's home. She stated that it was also normal for Davis to come to the home unannounced to visit. According to Mother, Davis drank heavily at the parties, and she believed him to be an alcoholic. Due to his drinking, Davis would be unable to drive and stayed overnight on many occasions. He would sleep in his car, on the porch, in the house, or wherever he passed out.

Mother stated that Davis was close to her two sons and bought extravagant gifts like a gaming system with games and gave them money. Looking back, Mother agreed it seemed odd. Davis spent time with Zeb alone in his room often playing games. Davis volunteered to watch Mother's children so she could run errands. While the family lived on Fourth Avenue, Mother testified that Davis had a close relationship with her children, and she never questioned the nature of Davis's relationship with Zeb.

Mother testified that she and her ex-husband separated while Davis lived in Austin, though during Hurricane Rita, the entire family, including her ex-husband went to Austin. Mother said that she left her children with Davis to drive her ex-husband back to Nederland before returning to Davis's home in Austin. Mother stated that when he lived in Austin, he always went to her home in Nederland when he was in town.

Mother stated that after she and her ex-husband separated, she and the children lived in a duplex on Gage Avenue. Mother testified that Davis moved back to Nederland after her separation from her ex-husband when she lived on Gage Avenue. At that home, Zeb had his own room which was a converted single car garage. She stated that Davis was her best friend and that, with her children, she and Davis would go out to eat, go to concerts, and do many things. Mother did not recall Davis doing things with just one of her children.

Mother confirmed that Zeb and Davis were close and spent a lot of time together; Davis often bought things for Zeb that Mother could not afford, which seemed to strengthen their relationship. Though Zeb had anger issues at a young age, Mother recalled an instance where Zeb was mad at Davis. Mother later testified that she saw Zeb angry with Davis several times when they lived on Gage Avenue. According to Mother, Zeb did not want Davis in his room, was mad, and just wanted to be left alone. Mother confirmed that it was not common for Zeb to want to be left alone. Mother stated that she noticed these changes in Zeb while they lived on Gage Avenue.

According to Mother, Davis was last at her home on Gage Avenue on a Sunday, and Davis was cooking spaghetti. Mother shared that she was talking with her daughter in the bedroom but left and walked into Zeb's room. Mother stated that Davis was in Zeb's room, and neither of them heard her coming so she startled them.

4

Mother testified that Zeb was straddling a punching bag that was on the ground while looking at Davis's laptop on the bag in front of him. Mother stated that Davis was standing and leaning over Zeb from behind with his hands under Zeb's butt. Mother revealed that when she walked in, Davis jumped up and pulled his hands back. When Mother asked what they were doing, Davis nervously said, "Nothing. We're just looking at these games that [Zeb] wanted to look at." Mother pointed out that because she knows Davis well, his reaction made her want to see what was on the computer and signified that something was wrong in that situation. Mother instructed Zeb to show her the computer and without looking up, Zeb turned the computer, and a game was on the screen. At that point, Mother said she noticed that Zeb had an erection. She stated that she told Zeb to go shower and Davis that it was time for him to leave. Mother testified that Davis tried to say that he needed to finish the spaghetti, but she told him that she would finish it, and he left. Davis never returned to her home, never tried to contact her, and never tried to explain what occurred.

Mother testified that at the time of the incident, Zeb was thirteen or fourteen. She said that she did not try to speak with Zeb about what she saw that night but waited until the next morning when Zeb got up for school. Mother testified that Zeb told her that Davis had been inappropriate with him and had been touching him, but Zeb never provided her with details of the abuse. Mother testified that she spoke with Zeb about reporting the incident to police, but Zeb did not want to do it and did

5

not want to be embarrassed. Mother stated that she made an appointment with a counselor, Mark Thompson, for her and Zeb to help navigate through this. Mother did not remain in the room while Zeb spoke with Thompson, but after the session, Thompson told Mother to file a report with Child Protective Services ("CPS"), and CPS would contact the police.

Mother testified that she reported the incident to CPS, but no investigation occurred. Mother then went to the Nederland police station and was told that Zeb needed to come in and report it with her, but Zeb refused to go and just wanted it to go away. However, over time, Zeb decided to report the abuse.

Mother stated that months after the incident she saw Davis at a bar, and she explained to him how betrayed and heartbroken she was about what he did. On the day she testified, Mother confirmed that she still did not know the specific details about what Davis did to Zeb.

Mother testified that she asked her younger son, Matt, if he had ever been touched inappropriately by someone in the home. Though Matt initially denied being touched inappropriately, when he was seventeen, he finally told Mother that he had. Once Matt came forward, Zeb decided it was time to file charges.

Next, Detective Matt Gardner with the Jefferson County Sheriff's Office testified that he worked on special crimes in the investigative unit from 2017 to 2023. During this time, Gardner investigated crimes involving abuse of children, and he

investigated Zeb's case. According to Gardner, a patrol officer took a report from Zeb regarding allegations when he was younger. The case was assigned to Gardner, and he initially contacted Mother and obtained her statement. Gardner clarified that this was during Covid restrictions, so they conducted interviews on Zoom and had people type their statements and email them in. He continued his investigation and spoke with Zeb, who was twenty years old at the time.

Gardner testified that Zeb had very specific memories and details that he remembered with Davis, and he seemed genuinely affected by Davis. Though Zeb did not always remember when things happened, he related some things to certain events like concerts, then they could determine a more specific timeframe. Gardner testified that it is common for victims who are trying to recall abuse that occurred over a long period of time to associate the abuse with events, locations, or places.

Gardner testified that he spoke with Davis a couple of times over the phone and they met in his office in February 2021. The in-person interview ended when Davis said he was done; and a recording of the interview was admitted as evidence. According to Gardner, Davis acknowledged that the incident where Mother walked in on Davis and Zeb was true, and Gardner tried to help Davis rationalize what happened. Gardner testified that Davis acknowledged that some of what Zeb said occurred was true, and Davis offered to go to therapy. Gardner testified that during the interview, Davis seemed to suggest that he perceived the abuse as consensual.

At times, Davis completely denied the incidents or dodged the question. Gardner made it clear to Davis that a child fourteen or younger could not consent.

Gardner testified that he noticed several red flags during Davis's interview including his evasive answers, body language, closing off after certain questions, and he was very nervous from the middle to the end of the interview. Gardner pointed out that Davis had a tough time saying things. Davis told the officer that around that time he was discovering his own sexuality, or implied the relationship was consensual. According to Gardner, neither had any bearing on whether two or more acts of sexual abuse were committed. Based on his investigation, he found probable cause to support that two or more acts of sexual abuse had been committed by Davis against Zeb in a duration of over thirty days.

On cross-examination, Gardner admitted that he did not know Davis and had not met him before the interview. Gardner agreed that he did not know Davis's normal body language, and he would be guessing that Davis was acting nervous. He acknowledged that Davis thought he was coming to the interview to discuss a minor car accident, and Davis seemed surprised to discuss this case. Gardner testified that Davis denied everything until the end of the interview.

According to Gardner, he could not get in touch with Zeb, so he sent a letter requesting that Zeb contact him in ten days, or the case would be closed. Gardner confirmed that Zeb had contacted him and said that his phone had been broken.

Gardner stated that he did not know whether Zeb was just not ready to discuss the alleged abuse or if his phone was really broken. Gardner testified that he had two or three phone calls with Zeb, and that Zeb missed an appointment though Zeb indicated that he came by but could not get into the lobby. During one of the phone calls, Zeb told Gardner that he would write down what he remembered. Nevertheless, Gardner testified that Zeb did not provide any notes.

Gardner testified that Zeb mentioned that he saw a therapist and though he tried to get Zeb's records, he was unable to. Gardner indicated that he did not recall speaking with the therapist either.

Next, the State called Zeb to testify. Zeb stated that he lived in what he described as a party house from a young age where family friends and their children were at the house often. Zeb confirmed that Davis came into his life when he was a little older than five or six. Though he has a strong relationship with his parents now, Zeb shared that it was not always the case after his parents divorced and his father moved out of the house. Zeb testified that his relationship with Mother has always been extremely strong. Despite this, and even though Mother walked in on them, Zeb never divulged specific details or provided her with a clear timeline of the sexual abuse he endured from Davis. He explained that he never told Mother because he did not want her to blame herself, and he did not know how to express the issues that he suffered as a result of the trauma. He explained that he tried to rationalize what

happened, was angry, and did not trust most people. This led to Zeb's using marijuana and alcohol to cope with his feelings. According to Zeb, even at age seventeen, he would have refused to give answers about what happened. Zeb testified that he met his wife at age seventeen and began raising her children as his own. His relationship with the children helped him realize that he needed to change and move past this situation.

Zeb testified that he also did not tell his father about the abuse because his father was more of a friend than a father and not "the supportive type." He also did not confide in his siblings.

According to Zeb, Mother wanted him to report the incident that she walked in on between him and Davis, but he shut down and told her that he would not talk to the police if she called them. Zeb stated that the last thing he wanted was to be questioned about something that occurred for many years while he was still trying to figure it out. Zeb felt as though Davis took advantage of his family's situation, with his father not being present, while helping financially and with other tasks. Zeb testified that Davis filled the shoes of what would have been his father while simultaneously betraying him without Mother's knowledge. Zeb felt his parents' lifestyle created the opportunity for the sexual abuse to occur given the alcohol, drugs, and partying.

Zeb testified that he blames Davis for sexually abusing him. According to Zeb, Davis was a close family friend with his mother and father but became his mother's best friend after she divorced his father. Davis attended the house parties on the weekends, and he came to the house on Fourth Avenue during the week. Zeb testified that it was more common for Davis to be at their home while they lived on Gage Avenue.

Zeb testified that he recalled living on Fourth Avenue from birth until his parents separated in either 2005 or 2006. The family then lived in various places in Nederland, before living on Gage Avenue from 2012 to 2014. Zeb stated that the incident with Davis that Mother walked in on occurred at the Gage Avenue home. Zeb also recalled living on Fourth Avenue again from late 2009 to early 2011. Zeb stated that the date in the indictment, September 1, 2007 to July 31, 2013,[2] is the date range of every act of sexual abuse Davis committed against him.

Zeb testified that although he cannot state how many times overall Davis either touched him inappropriately, put his mouth on Zeb's genitals, or tried to have sex with Zeb, it was more than fifty, but he is unsure if it was more than one hundred.

---

[2]The reporter's record states that the State referenced the end date on the indictment as "the day before your 14th birthday, August 31st, 2013." However, the indictment indicates the end date is July 31, 2013, and the trial judge stated that the alleged period in the indictment is "on or about September 1st, 2007, through on or about July 31st, 2013." Zeb's date of birth is August 1st, so it appears that the State's reference to Zeb's birthday was incorrect.

According to Zeb, the first incident was in the summer of 2005 when they lived on Fourth Avenue during one of his parents' parties. At the time, Zeb was five, almost six. Zeb recalled being sent to his room to go to bed but woke in the middle of the night with his pajama pants pulled down and his shirt pulled up above his belly button while Davis performed oral sex on him. He specified that Davis's mouth was in contact with his penis. Zeb stated that he sat up and pushed Davis away, then Davis left the room. Zeb described pulling up his pants, climbing into his sister's loft bed across the room, and moving as far away from the door against the wall. Zeb stated that Davis was drinking at the party, and it was common for Davis to be intoxicated and for Zeb to smell alcohol on his breath when he did sexual things to Zeb. Zeb clarified that it was common for Davis to come in while he was asleep in the beginning, though that changed towards the end of the abuse, when Davis became "more aggressive." Zeb testified that he remembered what he wore because his Mother made him wear pajama pants even though they made him hot. Zeb explained that he remembered Davis looked up at him, and he has no doubt that Davis is the man who was performing oral sex on him. Zeb testified that Davis came back into the room minutes later, and after finding his bed empty, Davis saw Zeb in the loft bed. Zeb does not know where his sister was that night but stated that she was not in her bed because Zeb got in it. Zeb recalled Davis climbing up and asking what he was doing, and Zeb recalled that Davis had a smirk and a strong smell of

alcohol. Zeb testified that he did not recall responding to Davis, and Davis left the room and did not return that night.

Zeb testified that when he was in seventh grade, around 2012, they attended a concert in The Woodlands, and he made a comment to Davis about needing a new fishing pole. According to Zeb, Davis responded and said, "'If I get what I want, you'll get what you want.'" Zeb stated that they were staying in a hotel that night and he slept between Mother and Davis in the same bed. Zeb recalled that he woke up on his back and his pants were pulled down. Zeb said that Davis grabbed his right hand and was trying to force Zeb to touch Davis's penis. Zeb testified that Davis ultimately forced him to put his hand on Davis's penis, and Zeb pulled his hand away. Zeb stated that he pulled his pants up and rolled over and grabbed Mother and fell back asleep. He recalled that he woke up again with his back to Mother and facing Davis, and Davis was trying to force his tongue into Zeb's mouth. Zeb did not recall if Davis's pants or his pants were off. He stated that he remembered this incident because it was the first time there was contact between Davis's lips and his lips. Zeb testified that both Davis and Mother were intoxicated that night. Zeb stated that the next morning Davis took him to the store and bought Zeb a new fishing pole. Zeb acknowledged that he did not speak with anyone at The Woodlands Police Department about this incident.

Zeb testified that he realized this was not normal and that it was about Davis, not Zeb. Zeb indicated that he began to really resent Davis at that point, more than he already had. According to Zeb, this is around the time that he was very angry with his situation; he felt trapped and had no control of what was done to his body.

Zeb testified that he thought about telling someone but admitted that he was scared he would be in trouble or would not be believed.

Zeb recalled that a second incident occurred with Davis while in the same house on Fourth Avenue, although he could not recall how much time elapsed between the first and second incident. Zeb explained that the room was set up the same way, so he believes the second incident was soon after the first. The second incident was like the first in that Zeb was asleep on a night when his parents had a party, and he woke up to Davis holding his pants down and performing oral sex on him. Zeb testified that he recalled the hallway light being on and that once he woke up, he sat up and Davis left the room relatively quickly after. Zeb did not know if Davis touched his penis with his hands because he would wake up, and Davis was already actively performing oral sex. Zeb recalled an incident in the living room at the Fourth Avenue home where Davis put his hands on Zeb's genitals.

Zeb testified that there was a time later when Davis would continue and be more aggressive even after Zeb said to stop. Zeb stated that he had to push Davis off him, and in later years, 2013 and 2014, he would kick Davis to get him away. Zeb

14

recalled that most nights his brother and sister were both sleeping in the room, but he cannot say for certain that they were in the room when this abuse occurred. He never asked his siblings if they heard or saw anything, and he does not recall either of them telling him that they did.

According to Zeb, he had an encounter with Davis in Austin around 2005 or 2006, though he did not recall exactly when Davis moved to Austin. Zeb was six years old then, and he recalled staying at Davis's home that weekend. Zeb testified that Mother was there, but he did not recall if his father was. Zeb recalled that he fell asleep on the couch in the living room and when he woke up, his pants were pulled down, and Davis was performing oral sex on him. Zeb stated that he sat up, and Davis left the room and went in the direction of his bedroom.

Zeb testified that he recalled when Davis would come to Nederland to visit and Davis would stay with them at the Fourth Avenue home, and that he once brought a PlayStation. Zeb did not recall if this incident was before or after the incident in Austin, but he testified that his parents had left, and Davis remained at the home. Zeb did not remember if his siblings were there. Zeb testified that he and Davis were sitting on the couch while Zeb played the video game. Zeb stated that his feet were propped in Davis's lap and that Davis began to rub his leg and go further up his leg. Zeb recalled that he was wearing loose fitting athletic shorts and that Davis made his way up his leg and grabbed his penis. Zeb did not recall Davis

15

saying anything or doing anything specific with his hands. Zeb stated that he dropped the game controller on the ground, slid away from Davis, and Davis left before returning and sat in the recliner away from him.

Zeb confirmed that Davis never did or said anything that made Zeb believe this was a consensual sexual relationship. Zeb recalled that many times when he moved away from Davis, Davis asked if he was ok or said it would be fine. Zeb indicated that he believed Davis was trying to give these assurances so that Zeb would not tell anyone.

Zeb testified that there were other incidents where Davis sexually abused him, but he is not clear of the timeline due to there being "a lot of moving parts" during the time his parents separated. Zeb pointed out that there were incidents where Davis was either visiting from Austin, or they were in a shared location, and he would wake up to Davis either performing oral sex on him or with Davis's hand on his penis. Davis did not try to have sex with Zeb during the time he lived on Fourth Avenue, though Davis did attempt to have sex with Zeb later. According to Zeb, Davis sexually abused him more after his parents separated, and Davis and Mother would still go out. At the same time, Davis's and Mother's relationship got closer. Zeb stated that it felt like Davis was around daily around 2010 and 2011 and when they moved to Gage Avenue. Zeb revealed that Davis and Mother would go out and drink

16

then return home intoxicated. Mother would go to bed, and before Davis would go to sleep on the couch, Davis would sexually abuse Zeb.

Zeb recalled an incident around 2011 when he was in seventh grade, and they were living with his maternal grandmother and went to a concert at Ford Park. According to Zeb, Mother was intoxicated after the concert and when Davis drove them home, he called Zeb back to the car once Mother and Zeb's brother went inside. Zeb testified that Davis was sitting in the driver's seat of his car with the door open and when he walked up, Davis attempted to grab his penis but did not touch him. Realizing what Davis was doing, Zeb stated that he quickly went inside and did not recall seeing Davis again that night. Zeb did not recall Davis saying anything after he stepped back, and Davis did not try to pull him closer. Zeb testified that this was the second concert at Ford Park that Davis took him to, and he acknowledged that he might have mixed up who was performing in a prior statement.

Zeb testified about another concert at Ford Park when they were living on Fourth Avenue. Zeb recalled that he, his siblings, Mother and Davis attended the concert and that Mother and Davis were drinking. According to Zeb, he fell asleep on the couch, but Mother later woke him and told him to go to bed. Zeb remembered this because he wore a shirt that he bought at the concert and before getting in bed he folded it neatly and put it away. Zeb did not know for certain if something happened that night. Zeb recalled that Davis bought the concert shirt for him and

17

that towards the end of the abuse, Davis bought him many things, including cigarettes.

Zeb testified that Mother was in an abusive relationship with a man after she separated from his father. During that time, from late 2007 to 2009, Davis was not really around. Zeb could not say if from 2007 to 2013, he ever went an entire year without any sexual abuse from Davis. Zeb stated that there were times Davis was not around as often, but when he came into town, he would come over. Zeb later clarified that starting in 2010, Davis was around the house either daily or weekly, and Davis was sexually abusing him almost weekly, except for times he stayed at his grandmother's house. The abuse from 2010 to 2014 was always Zeb waking up to Davis doing something sexual to him. It would be a regular occurrence for him to be woken up by Davis with his pants pulled down and Davis's mouth on his penis.

Zeb testified that things got increasingly worse and aggressive when they lived on Gage Avenue. Zeb indicated that he started to push back, and he had grown a little bigger by then. Zeb recalled that once Davis and Mother had gone out and come home intoxicated, especially Mother. Zeb stated that he was twelve or thirteen and was sitting with his feet propped up on the couch and Mother went to her room at the end of the hallway, and Davis lay on the couch in front of Zeb and pulled Zeb's pants down and began to perform oral sex on Zeb. Though he tried, Zeb stated that because Davis was lying on him, he could not get away and even recalled putting

both of his hands on Davis's head to push him away. Zeb testified that after a few minutes, Mother walked in, and Davis quickly got up and went to the bathroom. Zeb stated that Mother sat in the recliner and appeared confused, and she was still extremely intoxicated. Zeb assumed Mother does not remember that night because she never said anything about it to him. Though relieved, Zeb testified that he was shocked that Mother did not say or do anything. He stated that Mother had a blank stare on her face and said nothing but then stumbled back down the hallway. Zeb indicated that he went to his bedroom and locked the door. This was the first incident that he specifically remembered on Gage Avenue.

Zeb testified that about two weeks later, he was asleep in his bed, and he woke up with no pants on and his feet were in the air. Zeb recalled the distinct smell of Vaseline, though he did not see a jar of it. Zeb explained that Davis was holding his ankles in each hand, and Zeb felt a very sharp pain in his anus. He stated that he realized Davis was attempting to insert his penis into him, and he began to struggle, and it caused Davis to lose his grip on Zeb's right ankle. Zeb indicated that he then kicked Davis in his chest causing Davis to fall back on the bed. Zeb testified that he then scooted as close to his headboard as he could, and Davis rolled off the bed, grabbed his pants, and left the room. Zeb stated that Davis walked out of the room naked. According to Zeb, this was the first time that Davis tried to have sex with

19

Zeb. Zeb indicated that he checked himself after Davis left and found Vaseline on his anus. Zeb stated that Mother was in the house that evening.

Zeb testified that before that incident, Davis came into his room while he was asleep and when Zeb woke up his pants were down. Zeb recalled that he screamed at Davis to get out of his room and Davis asked what was wrong before leaving. Zeb did not recall Mother coming to check on him after he screamed.

As to the incident that Mother witnessed, Zeb testified that it was the last incident on Gage Avenue in January 2014 when he was fourteen years old. Zeb recalled that he received a punching bag for Christmas to deal with his anger, and the punching bag was on the floor. According to Zeb, he was sitting on the punching bag with his laptop in his lap when Davis came into his bedroom and crouched behind him. Zeb testified that Davis used his left hand and grabbed his penis outside of his clothing. Mother walked in, and Zeb recalled the look on Mother's face indicated that she knew something was wrong. Zeb testified that Mother told Davis to leave and that Davis was startled because he tried to clean the kitchen, but Mother insisted that he leave. Davis left the house, and that was the last time Zeb saw Davis.

Zeb testified that Mother tried to talk but he shut down because he knew at that point it was over with, and he decided not to discuss it with anyone. He recalled Mother taking him to a counselor, and though he told the counselor that something happened, he did not provide any details.

20

Zeb stated that he has worked as a Beaumont police officer since December 2022, and there are instances when his personal experiences have helped him talk with others and let them know they are not alone. Zeb testified that he encourages others to speak up even if they do not want to file charges. Zeb indicated that he finally decided to come forward to protect his brother.

Zeb testified that although he alleged Davis sexually assaulted him in Austin, he has never spoken with law enforcement in Austin or Travis County about the incident. Zeb stated that he never confided in a teacher, pastor, priest, his dad, his brother or anyone during the period alleged in the indictment.

Next, the State called Brother to testify. Brother indicated that he is Zeb's younger brother. Brother testified that he was released from the Jefferson County Jail the previous day following his arrest for drugs and auto theft. Brother admitted that he had many problems in his life related to drugs, drug abuse, and theft since high school. Brother testified that he has used ecstasy, cocaine, and methamphetamine and has learned his drug use was his way of dealing with his trauma. Brother said that after he testified, he was going to a recovery facility for six months to a year to get his "life on track." Brother said he wanted to testify against Davis before entering rehab.

According to Brother, while in jail he spoke with Detective Chad, a special crimes officer, about his history with Davis. Brother described the Fourth Avenue

21

home as a party house and said Davis and several others were always there. Brother testified that during the parties, he and Zeb would be in the room playing video games. Brother agreed with Zeb's timeline of the places they lived and agreed that towards the end of the time they lived on Gage Avenue, they did not see Davis much anymore. Brother identified Davis at trial and testified that he later learned that Mother walked in on Davis doing something inappropriate to Zeb, but he did not know the details, and he did not question why Davis did not come around anymore.

Brother did not recall ever seeing Davis do anything sexual with Zeb. Brother testified that Davis did sexually inappropriate things with him. Brother recalled that when he was about seven years old, around 2008, Davis came into his bedroom, slid his hand up Brother's clothes, and put his hand on Brother's penis. He did not recall if Zeb was in the room the first time this occurred, although he recalled Zeb being asleep in the room at other times. Brother explained that Davis would slide his hand underneath Brother's clothes, grab his penis with two or three fingers, and stroke it up and down. Davis would do this for five to fifteen minutes. Brother testified that he was not always asleep when Davis did this, and sometimes he was playing a game or watching television. Brother stated that he does not know what would make Davis stop and that Davis drank a lot when this occurred. Brother admitted that he could not recall if he smelled alcohol on Davis's breath or if Davis was intoxicated, but at

22

that time, Brother's parents drank heavily and the friends who came over would be outside drinking also.

According to Brother, Davis did this to him approximately five to six times a month from the first incident around 2008 to the end of 2010 or early 2011, when they moved out of the Fourth Avenue house. Brother recalled that Davis was around those three years and came into his room regularly at night and touched his penis. When Davis touched his penis, Brother stated that Davis told him that it was okay. Brother recalled telling Davis to stop because it tickled, and Davis told him that it was okay and that is what it was supposed to feel like. Brother added that there were times when Davis pulled his pants down, exposed Brother's penis, and touched Brother's penis with his hands. Brother did not recall Davis ever putting his mouth on Brother's penis, trying to have Brother put his mouth on Davis's penis, or trying to have anal sex with him. Brother testified that he never told anyone what Davis did because he thought it was normal.

Brother testified that when they lived on Gage Avenue, Davis was still always around, and he did not feel like Davis was betraying his trust by touching him inappropriately. However, around middle school, in seventh grade, Brother realized that what Davis was doing was wrong. Brother stated that he did not see it as wrong, but he did not want to be accused of being homosexual. Brother signified that in the past he was confused about his sexuality, and Davis was a big part of his confusion.

23

During the time they lived on Gage Avenue, Davis would still come into Brother's room and touch his penis, but Davis did not perform any acts of oral or anal sex on Brother. Brother pointed out that it did not occur as much but would happen when Davis was acting as their babysitter.

Brother recalled Davis disappeared around 2014 and Brother later learned, in 2019, it was because Mother walked in on Davis doing inappropriate things with Zeb. At that time, Brother recalled that he told Mother that he wanted to go to rehab, and Mother said that she wanted to ask him something. According to Brother, Mother said Davis's name, and Brother stopped her and told her that he knew what she was asking and that it did happen. Brother shared that Mother told him that he needed to talk to Zeb. Brother testified that he was confused about why he needed to talk to Zeb, and Mother told him that it happened to Zeb also. Brother stated that Mother told him about the incident that she walked in on between Zeb and Davis.

Brother admitted that he and Zeb talked about their abuse two or three times but never with major details; after telling Zeb what happened to him, Zeb revealed that the same thing happened to him. Brother stated that after Davis went away in 2014, he did not see him again until the day of his testimony. The State then rested its case, and Davis did not call any witnesses. After deliberating, the jury convicted Davis of continuous sexual abuse of a young child as charged in the indictment. The

24

jury assessed punishment at life imprisonment, and the trial court sentenced him accordingly.

**Analysis**

In five issues Davis challenges his conviction. In two issues, Davis challenges the admission of certain evidence and argues the trial court (1) admitted improper hearsay in the form of a chart or statement prepared out of court and (2) admitted speculation by a witness. In his next three issues, Davis complains that the trial court committed fundamental and egregious error by instructing the jury it could convict him on less than a unanimous verdict, that he was denied due process by the failure to require a unanimous verdict regarding the specific allegations of criminal conduct to support the conviction, and that Texas Penal Code section 21.02 is unconstitutional as applied to him since under section 21.02(d) the jury was not required to return a unanimous verdict.

In his first issue, Davis argues that the trial court admitted a chart that was prepared out of court that related to the allegations in the indictment. The chart indicated addresses and dates that Zeb lived at the address along with "other places in Nederland" written between the specific addresses. Davis asserts that the exhibit was shown to be allegations of fact that were inaccurate and "guesses" of the witness.

We review the trial court's admission of evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

25

A trial court's ruling on the admission of evidence will be overturned only if the ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). If the trial court's evidentiary ruling is correct on any theory of law applicable to the case, that ruling will not be disturbed even if the trial judge gave the wrong reason for his right ruling. *De La Paz v. State,* 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Hearsay is defined as an out of court statement which a party is offering to prove the truth of the matter asserted by the statement. Tex. R. Evid. 801(d). Texas Rule of Evidence 802 states that hearsay is not admissible unless it falls within an exception to the hearsay rule. *Id.* 802; *Hayden v. State*, 928 S.W.2d 229, 231 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). "An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) (italics in original) (citations omitted); *see also Richter v. State*, 482 S.W.3d 288, 300 (Tex. App.—Texarkana 2015, no pet.) (citations omitted). "An extra-judicial statement or writing may be admitted as circumstantial evidence from which an inference may be drawn, and not the truth of the matter stated, therein, without violating the hearsay rule." *Gholson v. State*, 542 S.W.2d 395, 398 (Tex. Crim. App. 1976) (citation omitted); *Dinkins*, 894 S.W.2d at

26

347; *see also Dominguez v. State*, 474 S.W.3d 688, 698 (Tex. App.—Eastland 2013, no pet.).

The document at issue was admitted as evidence and is a chart with two houses identified by street name, with years that Zeb recalled living at the location. Written between the two addresses is "other places in Nederland" for years not included. Specifically, the document indicates that Zeb recalled living in a home on Fourth Avenue in Nederland, Texas from August 1, 1999, to 2005-2006. The other location notes that Zeb recalled living in a duplex on Gage Avenue in Nederland, Texas from around 2012 to 2014. Written between the two addresses is "other places in Nederland" with an arrow pointing up and down on each end.

In his testimony, Zeb was questioned several times about where he lived and the dates. Zeb testified that he first recalled Davis being around when the family lived on Fourth Avenue. Zeb conveyed that his parents were still married and living together when they lived in the Fourth Avenue home, and he recalled staying at that home after his parents' separation around 2005 or 2006, but never permanently. He stated that after his parents' separation and before living on Gage Avenue, there was a lot of moving, and the family lived in several places in Nederland. Zeb testified that after they lived on Gage Avenue, they lived in the Port Neches-Groves area before moving back to Nederland.

Zeb's testimony resumed the next day with the State clarifying the dates that Zeb lived in the Nederland area, and Zeb explained that the family lived in the home on Fourth Avenue from the time he was born until his parents' separation at the end of 2005 or beginning of 2006. Zeb again agreed that they lived in a few different places in the Nederland area before they moved to the duplex on Gage Avenue in 2012. Zeb testified that he lived on Gage Avenue until February or March 2014 before they moved to Groves.

During Zeb's testimony, the State pointed out that it was creating a document that listed the dates discussed and clarified that it was making notes on the document of the dates Zeb lived on Gage Avenue. The State introduced the document that detailed the addresses and dates discussed above, and Zeb agreed that the document was accurate and would be helpful for the jury to understand the timeline and dates discussed at trial. Davis objected to the chart as hearsay and cumulative to which the State responded that Zeb assisted in making the chart. The trial judge stated that it was a product of Zeb's testimony and statement. The State then went over the details of the document with Zeb, and Zeb again agreed that it was accurate.

The record demonstrates that the document was a summary of Zeb's testimony and was offered as a demonstrative aid for the jury showing where and when Davis sexually abused Zeb and Zeb's approximate age at the time of the abuse. The record shows that the document was created by the State simultaneously during

28

Zeb's testimony. Although Zeb acknowledged that the specific dates were difficult to recall, Zeb's testimony aligned with the location and dates on the document. The record also shows that the details in the document were cumulative of other evidence at trial as the jury heard the testimony of Mother and Brother that further confirmed the details of the document. Therefore, based on the record as a whole, we conclude the trial court did not abuse its discretion in the admission of the evidence. *See Dinkins*, 894 S.W.2d at 347. We overrule issue one.

Next, Davis complains that the trial court admitted speculative testimony from Mother. Davis argues that Mother's testimony included speculation regarding why Zeb had not told her the details of his abuse at the hands of Davis. Davis asserts that the admission of Mother's speculation weakened his defense that Zeb told no one what Davis did to him because Davis did not abuse Zeb.

During trial, the following exchange between Mother and the State occurred:

> Q. Now, has [Zeb] ever really told you the full extent of what his abuse was with Lonnie?
> A. No. He has never told me details.
> Q. Do you know why [Zeb] has not ever told you everything?
> A. I do.
> [Defense Counsel]: Objection, your Honor. Calls for speculation.
> The Court: Not if she knows.
> [Defense Counsel]: I still have to lodge the objection, your Honor.
> The Court: Overruled. Knowledge and speculation are two different terms, and people are not supposed to speculate. But if you know the answer, you can answer. Go ahead.
> A. To protect me.

29

Q. (By [The State Prosecutor]) Why would he need to protect you?

A. He didn't want me to think this was my fault.

Although the rules of evidence do not include a specific rule about speculative testimony, the rules do address opinion evidence. *See* Tex. R. Evid. 701–04. An objection that a question calls for speculation is an objection that the question calls for an opinion outside the personal knowledge of the witness, and such an objection thus implicates Rules of Evidence 602 and 701. *See id.* 602, 701; *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). Rule 602 permits a witness to "testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tex. R. Evid. 602. Rule 701 permits a lay witness to testify to an opinion that is "(a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determine a fact in issue." *Id.* 701. Here, the State asked Mother if she knew why Zeb never told her about the abuse and she responded that she did. Mother was then directed by the trial judge to answer if she knew, to which Mother responded that Zeb did not tell her to protect her from thinking it was her fault. Though Mother was not further questioned about her knowledge on cross-examination, Zeb's testimony confirmed that Mother feels guilty when they discuss his abuse and that Mother feels as though "she allowed it in some type of way[.]" Although Mother may not have had personal knowledge of Zeb's reasons for not telling her about Davis's conduct,

the record supports the admission of Mother's rationally based opinion on the matter, and we cannot say the trial court abused its discretion in overruling Davis's "speculation" objection. *See id.* 602, 701. We overrule Davis's second issue.

In issue three, Davis complains that the trial court committed fundamental and egregious error by instructing the jury that it could convict him on less than a unanimous verdict. Davis failed to assert this challenge to the jury instruction when his case was before the trial court. However, it is well-established that jurors must unanimously agree on all elements of the crime to convict a defendant but need not agree on all underlying facts that make up an element. *Ngo v. State,* 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). Here, section 21.02(d) requires the jury to agree unanimously that the defendant, during a period that is thirty or more days in duration, committed two or more acts of sexual abuse. Tex. Penal Code Ann. § 21.02(d). The language in the jury instructions complies with section 21.02(d) of the Penal Code. *Id.*; *Turner v. State,* 573 S.W.3d 455, 462-63 (Tex. App.—Amarillo 2019, no pet.) (explaining that a jury charge for continuous sexual abuse of a child must make it clear that the first and last acts alleged must occur thirty or more days apart). The instructions here did not allow the jury to convict Davis on a non-unanimous verdict, and similar arguments of jury unanimity have been rejected. *Ingram v. State,* 503 S.W.3d 745, 747-48 (Tex. App.—Fort Worth 2016, pet. ref'd);

31

*McMillian v. State,* 388 S.W.3d 866, 873 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We overrule issue three.

In issues four and five, Davis argues that he was denied due process by the failure to require a unanimous verdict regarding the specific allegations of criminal conduct to support the conviction and that Texas Penal Code section 21.02 is unconstitutional as applied to him since under section 21.02(d) the jury was not required to return a unanimous verdict. An "as applied" challenge depends upon the evidence adduced at a trial, and a defendant must preserve a constitutional due process complaint by making an objection at trial. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). In other words, to preserve error a defendant must make a specific, timely challenge to the constitutionality of a statute as applied to him. *See Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995). In this case, Davis did not object to the trial court's charge on the basis that it failed to provide for a unanimous verdict. Likewise, Davis did not object that the jury charge denied him due process or was unconstitutional as applied to him. Therefore, Davis failed to assert this challenge to the statute when his case was before the trial court. An "as applied" constitutional challenge to a statute is forfeited if not asserted at the trial court level. *See Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014) (citations omitted).

On the other hand, a facial challenge is based solely upon the face of the penal statute and the charging instrument. Generally, to preserve a complaint for appellate review, the defendant must present the complaint to the trial court in a timely request, objection, or motion. Tex. R. App. P. 33.1(a)(1). In other words, a facial challenge to the constitutionality of a statute is a forfeitable right that the defendant fails to preserve if he does not raise the issue in the trial court. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009); *Curry*, 910 S.W.2d at 496. Again, Davis did not object to the trial court's charge on the basis that it failed to provide for a unanimous verdict. Likewise, Davis did not object that the jury charge denied him due process or that the statute was facially unconstitutional. Since Davis was required to raise his "as applied" and facial challenges at trial and did not, he has not preserved his fourth and fifth issues for appellate review. *See* Tex. R. App. P. 33.1. We overrule issues four and five.

## Conclusion

Having overruled all of Davis's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on October 28, 2025
Opinion Delivered February 25, 2026
Do Not Publish
Before Golemon, C.J., Johnson and Chambers, JJ.